[Cite as *Victor v. Kaplan*, 2020-Ohio-3116.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

VLADIMIR B. VICTOR,                          :

    Plaintiff-Appellant/                    :
    Cross-Appellee,

                               :        No. 108252

    v.                                       :

MARINA KAPLAN, ET AL.,                       :

    Defendants-Appellees/                   :
    Cross-Appellants.                       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART; AND REMANDED
**RELEASED AND JOURNALIZED:** May 28, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-15-358403

---

### *Appearances:*

Cavitch, Familo & Durkin, Co., and Roger L. Kleinman, *for appellant/cross-appellee.*

Rosenthal | Thurman | Lane L.L.C., and Scott S. Rosenthal *for appellee/cross-appellant* M.K.

Skirbunt & Skirbunt L.L.C., James R. Skirbunt, and Sharon A. Skirbunt, *for cross-appellee* Skirbunt & Skirbunt, L.L.C.

MICHELLE J. SHEEHAN, J.:

**{¶ 1}** Plaintiff-appellant Vladimir B. Victor ("Husband") appeals from the judgment of the Cuyahoga County Court of Common Pleas, Domestic Relations Division, adopting the magistrate's decision primarily regarding distribution of marital assets, as modified. Defendant-appellee/cross-appellant Marina Kaplan ("Wife") also appeals the judgment. Third-party defendant/cross-appellee Skirbunt & Skirbunt, L.L.C. ("Skirbunt") answers Wife's cross-appeal concerning the trial court's granting of Skirbunt's motion to intervene and the trial court's award of attorney fees. For the reasons that follow, we affirm in part, reverse in part, and remand.

## I. Procedural History and Substantive Facts

**{¶ 2}** Husband and Wife married on February 22, 2000. One child, J.V., was born as issue of the marriage and is now emancipated. Wife has one adult daughter, Rachel, from a previous marriage.

**{¶ 3}** During the marriage, Husband worked at various jobs. Initially, he worked as a computer and financial consultant with Richler Victor & Associates. He was also employed by Ameriprise as a financial advisor. At some point in time, however, Husband's license as a financial advisor was suspended. He then worked in real estate, primarily purchasing, managing, and rehabilitating rental properties.

**{¶ 4}** Throughout the marriage, Wife worked in the medical sales industry for several different companies. She worked at Bayless-Pathmark ("Bayless") as a

contractual employee from 1996 through 1998, and then under a different contract for the entirety of 1999, before marrying Husband in early 2000. Wife continued employment with Bayless into the marriage. According to Wife, at the end of 1999, she learned that her contract would not be renewed, so she began negotiations with Bayless. (Tr. 539, exhibit No. 69.) Wife continued working at Bayless in 2000, under different employment terms that expired on December 31, 2000. (Tr. 515, exhibit No. 9, 1495.) In 2000, Bayless offered Wife a new contract but she declined the offer. (Tr. 1501.)

{¶ 5} On October 12, 2001, Wife procured a structured settlement with Bayless for $350,000. Bayless agreed to make payments to Wife over five years, with the first payment payable within seven days of execution of the agreement.

{¶ 6} During the marriage, Husband and Wife had acquired numerous bank or investment accounts including the following: (1) FCI Global Chase Checking #5390; (2) FCI Global Chase Savings #8060; (3) A1 Huntington Money Market #9122; (4) A1 Huntington Checking #3639; (5) 1612 Wood Huntington Checking #8192; (6) 1534 Parkhill Huntington Checking #8189; (7) H Huntington #9122; (8) 4208 Cedar Huntington Checking #8202; (9) 3259 Desota Land Huntington #8163; (10) 3675 Randolph Huntington #7173; (11) Gevaldig Enterprises KeyBank Checking #2679; (12) H KeyBank Checking #2679; (13) MA Kaplan Living Trust Chase Checking #5660; (14) MA Kaplan Living Trust Chase Savings #7146; (15) MA Kaplan Living Trust NYCB Checking #3715; (16) MA Kaplan Living Trust KeyBank Checking #0198; (17) MA Kaplan Living Trust T.Rowe Price [#916]; (18) MA Kaplan

Living Trust Fidelity #4424; (19) W Fifth Third Checking #1516; and (20) MA Kaplan Living Trust Vanguard #9847.

**{¶ 7}** Throughout the marriage, the parties maintained the following retirement accounts: (1) FCI Global 401(k) Trust (Chase); (2) W Fidelity IRA #7888; (3) W Fidelity SEP IRA #6625; and (4) W Oppenheimer.

**{¶ 8}** Husband and Wife had also acquired interest in certain real estate. Husband claims an interest in the following real properties: (1) 1534 Parkhill Road; (2) 1612 Wood Road; (3) 3259 Desota Avenue; (4) 3316 Desota Avenue; (5) 3675 Randolph Road; (6) 3744 Berkeley Road; and (7) 4208 Cedar Avenue. Wife owned the following properties: (1) 3494 Shannon Road (the marital residence); (2) 3631 Bendemeer Road; (3) 2664 Brentwood Road; and (4) 2547 Edgewood Road.

**{¶ 9}** Husband and Wife accumulated credit card debt during the marriage, including the following: (1) Home Depot; (2) FCI Global Chase #8017; (3) Discover; (4) Amex #84008, #11001, #43007, and #9-71001; (5) Capital One #5299 and 1118; (6) British Airlines #2242; (7) Nordstrom; and (8) Citicards.

**{¶ 10}** On August 17, 2015, Husband filed a complaint for divorce, alleging gross neglect of duty and extreme cruelty and requesting that he be designated the residential parent of the minor child. On September 14, 2015, Wife filed an answer denying Husband's allegations and a counterclaim. The court issued restraining orders against both parties.

**{¶ 11}** The matter was heard before the court magistrate on May 8, 2017, June 12-14, 2017, June 19-20, 2017, July 24-28, 2017, and September 12, 2017. At

the time of trial, numerous motions filed by both Husband and Wife were pending, including several motions for attorney fees, motions to show cause, and motions to compel. On April 5, 2018, the magistrate issued a 42-page decision that also addressed the pending motions.

{¶ 12} The magistrate made initial findings of fact concerning the parties' credibility and conduct throughout the proceedings:

> The court finds both [Husband] and [Wife] lack credibility, generally. This finding is based on the totality of the parties' conduct during the pendency of this action, and more specifically their conduct during trial both in and out of court. This finding is based on the court's consideration and evaluation of the parties' testimony when compared to the testimony of the other witnesses, and also in comparison to each other's testimony.

{¶ 13} The magistrate noted in support that Husband refused to permit Wife's real estate appraisal expert witnesses to enter the structures he owns or to provide Wife with copies of the lease agreements for Husband's rental properties. Additionally, Husband "consistently feigned a lack of memory on matters of substance when it suited his purposes, yet conveniently remembered even seemingly insignificant details about matters [that] advanced his positions or arguments."

{¶ 14} Regarding Wife's behavior, the magistrate noted that Wife sold a piece of real estate in violation of the mutual restraining orders during trial, then "conveniently failed to disclose this fact while on the witness stand and under oath," despite being questioned about the real estate. The magistrate found that Wife had knowledge of the restraining orders, yet knowingly sold the property and

intentionally concealed this fact from the court. The magistrate further noted that Wife "frustrated the court's efforts to efficiently complete the trial and caused an undeterminable amount of delay by consistently refusing to answer the simplest and most straightforward questions during cross-examination."

{¶ 15} The magistrate then made findings concerning the parties' real and personal property, including the Bayless settlement proceeds, financial and retirement accounts, debt, allocation of parental rights, child support, and spousal support. And the magistrate entered a disposition concerning the approximately 31 pending motions. Both parties filed objections. In particular, Husband objected to nearly the entirety of the magistrate's decision, including the magistrate's disposition of various pending motions.

{¶ 16} On January 28, 2019, the trial court adopted the magistrate's decision as modified. The court addressed each of the Husband's objections as follows: objection Nos. 1-10, 12-13, and 16, overruled; objection No. 11, sustained in part; objection No. 14, sustained; and objection No. 15, sustained in part.

{¶ 17} The trial court's modifications to the magistrate's decision included the following: Husband's objection No. 11 addressing the magistrate's granting of Wife's motion and amended motion to compel response to records subpoena issued to [the attorney] and motion for attorney fees and expenses (motion No. 400500). The magistrate determined that Husband failed to provide discovery and ordered Husband to complete 50 hours of community service in lieu of a monetary sanction. The trial court found the community service order inappropriate and vacated the

sanction. The court instead ordered Husband to pay Wife's attorney fees in the amount of $2,000.

**{¶ 18}** In Objection No. 14, Husband argued that the magistrate erred in ordering Husband to pay for the minor child's annual health care costs. Finding the magistrate made a clerical error, because Wife "offered and requested to be responsible for" the minor child's health care in her closing arguments, the trial court sustained this objection and amended the magistrate's decision to reflect Wife's responsibility for the child's health care costs.

**{¶ 19}** In objection No. 15, Husband argued that the magistrate erred in adopting the guardian ad litem's ("GAL") proposed shared parenting plan, which designated Wife as the residential parent for school purposes. Husband proposed instead that both parents be designated as residential parent. Because J.V. is now emancipated, a shared parenting plan is moot, and we therefore decline to address the court's judgment pertaining to Husband's objection No. 15.

**{¶ 20}** Finally, the trial court overruled all six of Wife's objections.

**{¶ 21}** This appeal now follows.

## II. Assignments of Error

**{¶ 22}** Husband assigns the following 12 errors for our review:

I. The trial court's finding that the proceeds of an employment discrimination claim is Wife's separate property was error as a matter of law, an abuse of discretion, and contrary to the manifest weight of the evidence.

II. The trial court's finding that the assets in Wife's living trust and in Wife's name are Wife's separate property is error as a matter of law, an abuse of discretion, and contrary to the manifest weight of the evidence.

III.  The magistrate erred in determining Wife's separate property interest in four pieces of real estate owned by Wife and by Wife's living trust.

IV.  The trial court's finding that Husband had an ownership interest in 5333 Antisdale is error as a matter of law, an abuse of discretion, and contrary to the manifest weight of the evidence.

V.  The trial court's valuation of marital real estate was error as a matter of law and abuse of discretion.

VI. The trial court's allocation of all marital debt to husband was error as a matter of law and an abuse of discretion.

VII. The trial court's failure to award husband spousal support is an abuse of discretion.

VIII. The trial court's rulings on contempt motions/motions for attorney fees were contrary to the manifest weight of the evidence.

IX. The trial court's determination of attorney fees was an abuse of discretion.

X.  The trial court's support order is an abuse of discretion.

XI. The magistrate erred in adopting the GAL's proposed shared parenting plan.

XII. The trial court's failure to order a distributive award sufficient to effectuate an equitable division of the marital estate was an abuse of discretion and contrary to the manifest weight of the evidence.

**{¶ 23}**  Wife cross-appeals, assigning the following 9 errors for our review:

I. The trial court erred in prohibiting Wife from filing supplemental objections on the basis that Wife did not file a praecipe, when Wife gave notice of her intent to file supplemental objections in her preliminary objections, and when opposing counsel filed a praecipe.

II. The trial court erred by granting Wife's former counsel's motion to intervene.

III. The trial court erred when issuing a sua sponte award of attorney fees with no such motion pending, after the magistrate's decision but before the judgment of entry of divorce.

IV. The trial court erred and abused its discretion by imposing a $50,000 penalty against Wife for the alleged violation of the court's temporary restraining orders.

V. The trial court erred and abused its discretion when it failed to credit Wife for advancing $77,000 of attorney fees to Wife's counsel, and for Wife's payment of all of the GAL's fees in the amount of $20,000 from the final calculation of the division of assets and liabilities.

VI. The trial court erred and abused its discretion when concluding that Husband should be awarded $12,250 for personal property.

VII. The trial court erred and abused its discretion when including $58,418.64 in the division of property in addition to awarding Cross-Appellee a sum of $50,000, as this was a "double dip" of the proceeds from the sale of the property.

VIII. The trial court erred and abused its discretion in the division of personal property as failing to be substantiated by any credible testimony.

IX. The trial court erred and abused its discretion when it failed to award Cross-Appellant any child support during the pendency of the litigation.

### III. Standard of Review

{¶ 24} We review a trial court's determination in domestic relations cases for an abuse of discretion. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).

Since it is axiomatic that a trial court must have discretion to do what is equitable upon the facts and circumstances of each case, * * * it necessarily follows that a trial court's decision in domestic relations matters should not be disturbed on appeal unless the decision involves more than an error of judgment.

*Id.*, citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981).

{¶ 25} An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). And where there is some competent, credible evidence in the record to support the trial court's decision, there is no abuse of discretion. *Trolli v. Trolli*, 8th Dist. Cuyahoga No. 101980, 2015-Ohio-4487, ¶ 29, citing *Kapadia v. Kapadia*, 8th Dist. Cuyahoga No. 94456, 2011-Ohio-2255, ¶ 24.

{¶ 26} Concerning Husband's assigned errors regarding the trial court's distribution of the marital property, this court reviews a trial court's property division "as a whole, in determining whether it has achieved an equitable and fair division of marital assets." *Tyler v. Tyler*, 8th Dist. Cuyahoga No. 93124, 2010-Ohio-1428, ¶ 24, citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 222, 459 N.E.2d 896 (1984).

{¶ 27} R.C. 3105.171(C)(1) mandates an equal division of marital property, or "if an equal division is inequitable, the court must divide the marital property equitably." *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5. In order to determine what is equitable, the trial court must consider the factors outlined in R.C. 3105.171(F). *Id.* These factors include the duration of the marriage, the assets and liabilities of the spouses, tax consequences of the property division, any retirement benefits of the spouses, and "[a]ny other factor the court expressly

finds to be relevant and equitable." R.C. 3105.171(F)(1)-(10); *Kehoe v. Kehoe*, 2012-Ohio-3357, 974 N.E.2d 1229, ¶ 14 (8th Dist.) (stating that the trial court must take into account the parties' marital debt when dividing marital property). The trial court "'must indicate the basis for its division of the marital property in sufficient detail to enable a reviewing court to determine whether the award is fair, equitable, and in accordance with the law.'" *Johnson v. Mills*, 8th Dist. Cuyahoga No. 102241, 2015-Ohio-4273, ¶ 19, quoting *Franklin v. Franklin*, 10th Dist. Franklin No. 11AP-713, 2012-Ohio-1814, ¶ 4.

## IV. Husband's Appeal

### A. Bayless Settlement

{¶ 28} Husband's first assignment of error pertains to the Bayless settlement proceeds. The magistrate determined that the settlement proceeds were Wife's separate property because Wife's claim arose prior to the marriage:

> [T]he evidence establishes, and the court finds, [Wife's] claim against Bayless arose prior [to] the marriage. [Husband] disputed the chronology of events at trial, however, the court agrees [Wife's] timeline is supported by the evidence. [Wife's] premarital claim, which ultimately led to her acquisition of the settlement proceeds, was therefore separate, not marital, on temporal grounds.

{¶ 29} Husband objected to the magistrate's decision on the basis that Wife's claim against Bayless arose after the marriage and the settlement proceeds represented income that would have been earned during the marriage. He also testified at trial and argued in his objections that his marital labor in assisting Wife's

negotiations with Bayless produced a significantly better settlement and therefore the proceeds were marital.

{¶ 30} In his decision, the magistrate rejected, "without hesitation," Husband's "preposterous and narcissistic claim" that his marital labor produced a successful settlement with Bayless, finding that Wife's attorneys negotiated the settlement with Bayless. The magistrate stated that he based this decision upon the testimony of the parties and a consideration of the evidence. The magistrate stated that although Husband "inserted himself into the negotiations process and was included in some communications between those involved, * * * there is nothing in the record to show [Husband] was actually responsible for settling the dispute." The magistrate therefore concluded that Wife's premarital claim against Bayless was not converted from separate property to marital property based on Husband's actions.

{¶ 31} The trial court overruled Husband's objections and adopted the magistrate's decision on this issue in its entirety. In so doing, the court stated as follows:

> The magistrate properly found [Wife] presented ample evidence that this premarital claim, which ultimately led to [Wife's] acquisition of settlement proceeds, occurred well before her marriage to [Husband]. The parties were married on February 22, 2000. It appears the underlying action for [Wife's] claim occurred in 1999, prior to the marriage. Additionally, [Husband] was not involved in negotiations or responsible for settling the dispute.

{¶ 32} On appeal, Husband contends that the trial court's finding that the proceeds from Wife's claim against her former employer is separate property is error as a matter of law. In support, he argues once again that Wife's claim against Bayless

arose after the marriage, the settlement proceeds represented income that would have been earned during the marriage, and Husband's marital labor in assisting Wife's negotiations with Bayless produced a significantly better settlement and therefore converted the funds to marital property.

{¶ 33} When distributing property in a divorce proceeding, the trial court must first determine what constitutes marital property and what constitutes separate property. *Comella v. Comella*, 8th Dist. Cuyahoga No. 90969, 2008-Ohio-6673, ¶ 38, citing R.C. 3105.171(B). The determination of whether property is marital or separate is a mixed question of law and fact that will not be reversed unless it is against the manifest weight of the evidence. *Kobal v. Kobal*, 2018-Ohio-1755, 111 N.E.3d 804, ¶ 27 (8th Dist.). Once the characterization of the property is made, the reviewing court will not disturb the trial court's distribution of the property absent an abuse of discretion. *Id.*; *Williams v. Williams*, 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, ¶ 8.

{¶ 34} Property acquired during a marriage is generally presumed to be marital property, unless it can be shown to be separate. *Johnson*, 8th Dist. Cuyahoga No. 102241, 2015-Ohio-4273, at ¶ 18. The party seeking to have certain property classified as "separate property" has the burden of proof, by a preponderance of the evidence, in tracing the separate property. *Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831 at ¶ 49, citing *Peck v. Peck*, 96 Ohio App.3d 731, 734, 645 N.E.2d 1300 (12th Dist.1994).

{¶ 35} Marital property includes:

(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage * * *.

R.C. 3105.171(A)(3)(a)(i)-(iii).

{¶ 36} Marital property does not, however, include separate property. R.C. 3105.171(A)(3)(b). "Separate property" is any real and personal property or any interest in real or personal property that is any of the following:

(i) an inheritance by one spouse by bequest, devise, or descent, during the marriage;

(ii) any real or personal property or interest in real or personal property that was acquired by a spouse prior to the date of the marriage;

(iii) passive income and appreciation acquired from separate property by one spouse during the marriage;

(iv) any real or personal property or interest in real or personal property acquired by one spouse after a decree of legal separation * * *;

(v) any real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement;

(vi) compensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets;

(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

R.C. 3105.171(A)(6)(a)(i)-(vii).

{¶ 37} The commingling of separate property with other property does not destroy the identity of the separate property "except when the separate property is not traceable." R.C. 3105.171(A)(6)(b); *Woyt v. Woyt*, 8th Dist. Cuyahoga Nos. 107312, 107321, 107322, 2019-Ohio-3758, ¶ 22.

{¶ 38} Here, Wife contends that she is entitled to the Bayless proceeds as separate property because her "employment dispute" with Bayless (Wife's Brief, p. 4), which stemmed from the nonrenewal of her contract, predated the marriage. In support, she testified at trial that her claim was based upon her contract with Bayless for 1996-1999. Although Wife stated at her deposition that she retained an attorney in 2000 (tr. 397), she testified at trial that she retained an attorney in 1999 to renegotiate this contract, stating that she "started talking to Bayless in '99." (Tr. 489.)

{¶ 39} Regardless, the record shows that contract negotiations in fact occurred in 2000, and at some point, the subject of the negotiations changed:

Attorney: You would agree with me that on October 3, 2000, you had a meeting with your lawyers * * * ?

Wife: That's correct.

Attorney: And this was regarding contract negotiations?

Wife:  It was ongoing, yes.

Attorney:  Right.  And it was negotiations regarding a new employment contract for you, true?

Wife:  Right.  We were trying to negotiate.

Attorney:  And you would agree with me that at some point in time after you began the contract negotiations, the negotiations changed from the terms of a new employment contract to a severance contract, correct?

Wife:  At some point, yes.

(Tr. 490.)

{¶ 40}  And during this period of contract negotiations, Wife continued to work at Bayless in some fashion in 2000 and into 2001:

Attorney:  And you say that your employment agreement ended in 1999?

Wife:  Contractual.

Attorney:  You're contractual. And were the terms of your employment after the end of the contract better or worse?

Wife:  They were not the same terms.

Attorney:  Okay.  They were just different?

Wife:  There was no contract.

Attorney:  But you had a commission schedule, correct?

Wife:  Right.  Because I was bringing in business.

* * *

Attorney:  Okay. I'm looking at your income tax return that was attached as part of [an exhibit to your expert's report] for 2000.  And

I see that you made $197,253 in the year 2000; does that sound right? That's employment income.

Wife: Yeah.

Attorney: So although you're saying your employment contract ended in '99, you were still making the same amount of money in 2000, true?
Wife: I was bringing more business.

Attorney: Okay. And when did you ever work for Bayless as an independent contractor?

Wife: I think in 2001. * * * If I remember correctly.

Attorney: So your employment really had three stages to it. There was a period of time where you had an employment contract that renewed itself every year?

Wife: Right.

Attorney: There was a period of time where you were still an employee but not with an employment contract?

Wife: Transition.

Attorney: Right. And then there was a third period in which you were an independent contractor * * * or consultant.

Wife: Right.

* * *

Attorney: [Y]ou worked for Bayless throughout 2001, true?

Wife: Right. As a consultant.

* * *

Attorney: But while you were with Bayless, you weren't working for any other companies? * * *

Wife:  No.

(Tr. 532-535, 539; exhibit No. 69.)

{¶ 41}  Then on October 12, 2001, Wife executed a settlement agreement with Bayless in the amount of $350,000.  Bayless agreed to make payments to Wife over five years, with the first payment payable within seven days of execution of the agreement.  The settlement represented the income Wife would have earned over the next 18 months going forward:

> Attorney:  Now did you tell me that at the time you settled the case, your case with Bayless, that the $350,000 reflected the amount you would have earned over the next 18 months as an employee of Bayless?
>
> Wife:  That's correct, yeah
>
> Attorney:  You believe that during the next year alone you would have made $300,000, plus a contribution to the profit sharing plan, true?
>
> Wife: Yes.

(Tr. 408.)

> Attorney:  Your claim against Bayless arose from the Bayless's nonrenewal of your contract from 1999, true?
>
> Wife:  Correct.
>
> Attorney: Okay.  And * * * your claim was that you should have been earning more money in 2000, 2001, and forward, true?
>
> Wife:  Correct.

(Tr. 1496.)

{¶ 42}  Wages earned during a marriage constitute marital property. *Williams*, 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, at ¶ 12, citing

R.C. 3105.171(A)(3)(a)(iii); *Blevins v. Blevins*, 2d Dist. Greene No. 2018-CA-23, 2019-Ohio-297, ¶ 23. Likewise, "compensation for the loss of those wages during the marriage must also be marital property." *Id.*; *see Collins v. Collins*, 5th Dist. Stark Nos. 2010CA00283 and 2010CA00299, 2011-Ohio-4973 (finding the trial court's determination that the proceeds from the settlement of a sexual harassment lawsuit were separate property was against the manifest weight of the evidence where Husband and Wife testified the settlement was awarded as lost wages); *see also Budd v. Budd*, 9th Dist. Summit No. 25469, 2011-Ohio-565, ¶ 18, quoting *McKenzie v. McKenzie*, 2d Dist. Greene No. 2006-CA-34, 2006-Ohio-6841, at ¶ 15, quoting *McClure v. McClure*, 98 Ohio App.3d 27, 41, 647 N.E.2d 832 (2d Dist. 1994) (stating that "'"severance pay received during the marriage is marital property to the same extent that wages paid during the marriage are marital property"'").

{¶ 43} While Wife testified that she began contract negotiations with Bayless in 1999, before the marriage, the evidence shows that the settlement was executed in October 2001, during the marriage, and payments would begin within seven days of execution of the agreement. Moreover, Wife admits that the proceeds from the settlement reflected lost future wages — income she would have earned during the marriage. Wife also testified that she paid income tax on at least a portion of the settlement proceeds. (Tr. 535-536.) And there is no evidence that Wife was owed compensation for her employment with Bayless in 1999. In fact, Wife testified that she was under contract for the entirety of 1999 and that year proved to be her

highest year of compensation with Bayless. (Tr. 531.) The settlement proceeds are therefore marital property.

{¶ 44} To the extent Wife argues that her "employment dispute" with Bayless included a discrimination claim against her former employer and, therefore, the settlement proceeds are her separate property, we find no merit.

{¶ 45} Although there is some reference in the trial transcripts to Wife having a discrimination claim against Bayless,[1] Wife presents no testimony or documentary evidence supporting such a claim or itemizing any amount of the settlement proceeds that purportedly resulted from Wife's settlement of a discrimination claim. Moreover, the settlement agreement does not categorize any of the settlement proceeds as compensation for a discrimination claim. Wife therefore fails to satisfy her burden. *Beagle v. Beagle*, 10th Dist. Franklin No. 07AP-494, 2008-Ohio-764, ¶ 25 (finding Husband's claim that settlement proceeds from a personal injury lawsuit was compensation for his emotional distress, and not income replacement, lacking merit where Husband presented no documentary evidence concerning the lawsuit); *Barrientos v. Barrientos*, 3d Dist. Hancock No. 5-12-13, 2013-Ohio-424, ¶ 21 (finding Husband failed to sustain his burden of demonstrating what amount of the personal injury settlement was

---

[1] Under cross-examination, Husband's attorney questioned Wife about conversations she had with her employment attorney regarding a possible discrimination claim. Husband's attorney asked Wife if her employment attorney told her she had no actionable claim for employment discrimination or that "just because Dr. Schwartz was a jerk didn't make [the claim] actionable." Wife replied that she did not recall, and she stated that "anything is possible."

attributable to "personal injury" as opposed to "loss of marital earnings" and therefore his claim of separate property failed).

{¶ 46} Husband, however, testified regarding an email he sent to Wife's employment attorney, Alan Schabes, on Wife's behalf on July 4, 2001 (exhibit No. 72) that references discrimination. According to Husband, the email addressed "what [he] thought would be [their] claim [against Bayless.]" (Tr. 633.) The email stated that "[e]ver since March 2000 with the relocation to the Brecksville facilities, my quality of life has been diminished due to the harassment and tactics played at Bayless." The email then delineates Wife's claim against Bayless, which includes a claim for six months' severance pay following her contract termination in November 2000; salary owed for January 1 through December 31, 2000; salary owed for January 1 through April 2, 2001; unpaid commissions "for the term of my employment"; and profit-sharing contributions. Additionally, the email specifically asserts that Wife "ha[s] been harassed by Dr. Schwartz from March 2000 to the day I was asked to leave my office and not come back on April 2, 2001" and this harassment was allegedly because Wife "was the only woman in an executive position, which [Dr. Schwartz] wanted to dispose of."

{¶ 47} Therefore, even if we find that Wife in fact had a discrimination claim against Bayless, the record shows that this claim began in March 2000, which was during the marriage. Moreover, an employment discrimination claim in and of itself is not a personal injury claim, and therefore, a settlement awarded as compensation for employment discrimination is not separate property under R.C.

3105.171(A)(6)(a)(vi). *Williams*, 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, at ¶ 11.

{¶ 48} In light of the foregoing, we find the trial court's characterization of the Bayless settlement proceeds as Wife's separate property was against the manifest weight of the evidence.

{¶ 49} Husband's first assignment of error is sustained.

## B. Financial Accounts

{¶ 50} In Husband's second assignment of error, he contends that the trial court erred in finding the assets contained in the following accounts to be separate property: assets in Wife's Living Trust (Vanguard #9847, T.Rowe Price #916, and Fidelity #4424); and two retirement accounts (Fidelity IRA #7888 and Ameriprise IRA). In support, Husband argues that (1) the court erred in accepting the tracing methodology used by Wife's expert, John Davis; (2) the court erred in accepting Davis as an expert in retirement plans; and (3) the court erred in failing to find the growth in value of Wife's accounts with T. Rowe Price and Fidelity resulted from Husband's marital labor.

{¶ 51} Prior to the marriage, Wife had substantial assets, including several financial accounts, some of which were commingled with marital assets. Wife retained John D. Davis, C.P.A., to trace certain assets in these accounts as her separate property. Husband objected to Davis's methodology in tracing the separate property and to his qualifications as an expert in retirement plans. Over Husband's

objection, the court found Davis to be qualified as an expert and permitted his testimony.

**{¶ 52}** The court found, based on Davis's testimony regarding separate property, that the following financial accounts should be divided proportionally among the parties: (1) Vanguard #9847 — $42,744 (marital) and $582,102 (Wife's separate); (2) Fidelity #4424 — $179,725 (marital) and $308,656.00 (Wife's separate); and (3) Fidelity IRA #7888 — $180,902 (marital) and $363,149 (Wife's separate). Additionally, the court found that the T.Rowe Price account (valued at $300,950) shall be awarded to Wife as separate property. The court rejected Husband's contention that his marital labor on the accounts caused the growth in value of Wife's accounts.

### 1. Expert Testimony

**{¶ 53}** A trial court should generally admit expert testimony when it is material and relevant, and in accordance with Evid.R. 702. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16. Evid.R. 702 governs the admissibility of expert testimony and provides that a witness may testify as an expert if all of the following apply:

> The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**{¶ 54}** Therefore, under this rule, a witness may testify as an expert if he is qualified as an expert, the testimony relates to matters beyond the understanding of lay persons, and the testimony is based upon reliable information. *Azzano v. O'Malley-Clements*, 126 Ohio App.3d 368, 373, 710 N.E.2d 373 (8th Dist.1998), citing *Nichols v. Hanzel*, 110 Ohio App.3d 591, 597, 674 N.E.2d 1237 (4th Dist.1996).

**{¶ 55}** "Qualifications [that] may satisfy the requirements of Evid.R. 702 are multitudinous." *State v. Mack*, 73 Ohio St.3d 502, 511, 653 N.E.2d 329 (1995). There is no requirement that an individual possess a certain educational degree to qualify as an expert; rather, an individual's professional experience and training in a particular field may be sufficient to qualify one as an expert. *Id.* at 511; *State v. Harris*, 2018-Ohio-578, 107 N.E.3d 658, ¶ 40 (8th Dist.). Nor does a witness need to be the best witness on the subject in order to qualify as an expert. *Scott v. Yates*, 71 Ohio St.3d 219, 221, 1994-Ohio-462, 643 N.E.2d 105. "The expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary [factfinder]." *Id.*

**{¶ 56}** A determination of whether a witness is qualified to testify as an expert is a matter within the discretion of the trial court and will not be reversed "'unless there is a clear showing'" that the trial court abused its discretion. *State v. Lumbus*, 2016-Ohio-380, 59 N.E.3d 580, ¶ 95 (8th Dist.), quoting *State v. Wages*, 87 Ohio App.3d 780, 786, 623 N.E.2d 193 (8th Dist.1993), citing *State v. Maupin*, 42 Ohio St.2d 473, 330 N.E.2d 708 (1975).

{¶ 57} In determining whether an expert's opinion satisfies the requirements of Evid.R. 702(C), i.e., whether the opinion is reliable and therefore admissible, we consider whether the principles and methods employed by the expert to reach that opinion are reliable — "not whether his [or her] conclusions are correct"— and whether the expert's testimony "assist[s] the trier of fact in determining a fact issue or understanding the evidence." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 687 N.E.2d 735 (1998), citing Staff Notes to Evid.R. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, the ""ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.""" *Miller* at 614, quoting *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir.1990), quoting 3 Weinstein, *Evidence*, Section 702[03], at 702-35 (1988).

{¶ 58} And the credibility to be afforded the expert's conclusions remains a matter for the trier of fact. *State v. Nemeth*, 82 Ohio St.3d 202, 210, 1998-Ohio-376, 694 N.E.2d 1332. Thus, "'[a]ny relevant conclusions [that] are supported by a qualified expert witness should be received unless there are other reasons for exclusion.'" *Id.*, quoting *State v. Williams*, 4 Ohio St.3d 53, 57, 446 N.E.2d 444 (1983).

{¶ 59} A trial court's ruling as to the admission or exclusion of expert testimony is within its broad discretion and will not be disturbed absent an abuse of

that discretion.  *Chattree v. Chattree*, 2014-Ohio-489, 8 N.E.3d 390, ¶ 38 (8th Dist.), citing *Miller* at 616; *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 57.

### a. Qualifications

{¶ 60}  Here, Davis testified concerning his qualifications as an expert witness.  He has been a certified public accountant since 1986; he is accredited in business valuation since 1998; and he is a certified fraud examiner since 2006.  He has previously been qualified as an expert on tracing approximately 25-30 times and has testified as an expert on tracing in five Ohio counties, he is currently writing a course for the American Association of Matrimonial Lawyers ("AAML"), and he is a frequent lecturer on tracing.  At the time of trial, Davis was preparing materials for his lecture for the AAML that included the acceptable methodologies of tracing, such as direct tracing, proportional share, and lowest intermediate balance.  Additionally, Davis stated that he recently testified as an expert regarding asset tracing in an ERISA case and asset tracing in a divorce case.  In the most recent divorce case, his testimony included an opinion on proportional share tracing methodology.[2]

{¶ 61}  Regarding his qualifications as an expert in retirement plans, Davis stated that his practice as a certified public accountant qualifies him as an expert on ERISA, or retirement plans, because a substantial part of his practice involves 401(k) profit sharing and the firm performs audits.  Davis testified that although he does

---

[2] *See Forcier v. Forcier*, 11th Dist. Geauga No. 2019-G-0192, 2019-Ohio-5052.

not possess certain specialized certifications as a pension consultant or pension administrator, he possesses the knowledge and 30 years of experience necessary to testify as an expert in the area of retirement plans.

{¶ 62} Based upon the foregoing, we do not find the trial court abused its discretion in finding Davis's accounting expertise useful in this case and qualifying Davis as an expert.

{¶ 63} There is no dispute that Davis's testimony concerning the tracing of the parties' financial and retirement accounts relates to matters beyond the understanding of lay persons. We therefore turn to the methodology Davis used in tracing Wife's separate property.

### b. Methodology

{¶ 64} Husband contends that the proportional share methodology Davis used in tracing Wife's separate property is not reliable. In support, he argues that the proportional share method is contrary to the tracing requirements of R.C. 3105.171 because it eliminates any possibility of commingling, it "avoids the hard work of tracking the history" of the marital investments, and it violates Evid.R. 703, because the method "assumed significant withdrawals were proportionately marital and separate." He also argues that Davis's report does not account for a certain "gap" in records pertaining to particular funds and that Davis did not account for a large withdrawal from the Vanguard account, thus making Davis's analysis unreliable.

{¶ 65} As previously stated, the party attempting to classify property as "separate property" has the burden to establish such traceability. *Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, at ¶ 49. Once that party has met his or her burden in tracing the property as separate, the burden shifts to the other spouse to show that the particular funds were not separate, i.e., were marital, or to provide some evidence challenging the spouse's ability to trace the assets. *Bauer v. Bauer*, 12th Dist. Warren Nos. CA2019-04-033 and CA2019-04-040, 2020-Ohio-425, ¶ 35; *Johnson v. Johnson*, 2d Dist. Greene No. 2018-CA-36, 2019-Ohio-1024, ¶ 15. Here, Husband failed to provide his own expert to challenge Davis's testimony concerning the tracing of the various financial accounts or to discredit Davis's method of tracing. And a trier of fact "'may not disregard credible and uncontradicted expert testimony[.]'" *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2016-Ohio-7461, 64 N.E.3d 1018, ¶ 26 (9th Dist.), quoting *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 74; *Beachwood v. Pearl*, 2018-Ohio-1635, 111 N.E.3d 620, ¶ 42 (8th Dist.).

{¶ 66} The statute governing the division of marital and separate property, and the commingling of such funds, provides that "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). The statute, however, does not specify the methodologies that must be used to trace the property. Davis's proportional share method is therefore not proscribed by the statute. Moreover, Davis asserted that the

proportional share method has been adopted by courts in Ohio. And Husband provided no evidence that the proportional share method is not a valid method of tracing for purposes of satisfying the statute.

{¶ 67} Davis testified that he in fact used two methods for analyzing the parties' assets: (1) direct tracing, and (2) proportional share. He explained that direct tracing is most useful when the identified funds are identified in a separate account with no additional activity, or the funds were used entirely to acquire another item of value, or "when you can trace one item of value directly to another item of value." (Exp. Report) (Tr. 983.) Davis further explained that the proportional share method is necessary "once the funds became commingled." (Tr. 1009.) It is a way of "accomplishing allocating income." (Tr. 1037.)

{¶ 68} Davis described proportional share as follows:

Proportional shares deals with assets that have become commingled. What you have now is you have two categories of assets. In this case, in Domestic Relations, you have marital and nonmarital. And what proportional share does, it measures any of the income that is being earned based on the relationship of each of those categories to the total. And it would treat dissipation of those assets the same way based on its proportion of the fund to the total.

* * *

An example would be if you had a fund that was entirely nonmarital at $90,000, and then $10,000 was added to that that was marital. You now have a fund worth $100,000. Then what would happen is if there's income earned of a thousand, you would prorate it, 90 percent of that income would be deemed to be earned by the nonmarital, in this example, and 10 percent would be for marital. Then if the fund were dissipated, they would be dissipated[, meaning withdrawn or spent,] the same way, the 90/10. That ratio stays the same until any other nonmarital funds would be added to the fund.

{¶ 69} According to Davis, the methodology used depends upon the facts of the case, stating that the data and "flow of funds" dictate which method is most appropriate. And in this case, Davis explained, he used the direct tracing method on certain funds (Fund 9) that existed at the date of marriage, had only investment appreciation, and then was exchanged for a different fund (Fund 21). (Tr. 1008.) Davis stated that in that case he was able to trace the assets directly from one fund to another. On the other hand, for example, Davis analyzed Fund 51 (nonmarital property) under the proportional share method because assets from Fund 123, which contained marital and nonmarital assets, commingled with Fund 51. Therefore, according to Davis, once those funds became commingled, it became necessary to use the proportional share method. Husband provided no expert testimony to refute Davis's testimony.

{¶ 70} In light of the foregoing, we find the trial court did not err in accepting the proportional share method utilized by Davis.

{¶ 71} Husband claims that, in using the proportional share method, Davis "missed" a $36,584 withdrawal from the Vanguard account. Specifically regarding the Vanguard account, however, Davis testified that he accounted for the $36,584.64 withdrawal (tr. 1047) and he directed counsel to Appendix H of his report. Davis explained that the $36,584.64 came from Fund 51 and was noted on Appendix C-1, and of that amount, he calculated $7,151 as marital assets. Davis

further explained that the funds then dissipated and once they dissipated, he no longer traced them.

{¶ 72} Regarding the Fidelity account, Husband claimed that Davis "missed" marital deposits: (1) $32,166.24, "added after the date of the marriage"; (2) $10,000, allegedly deposited on May 11, 2000; and (3) $18,000, allegedly deposited on September 29, 2000. Husband argues that Davis was therefore precluded from properly tracing the funds in this account. In support of his argument, Husband refers to Davis's cross-examination in which counsel presented copies of two checks purportedly deposited into a Fidelity account:

> Q: Now, I want to show you what we've marked as Plaintiff's Exhibit 67. And I direct you to page 4 of that exhibit. And I want you to look at the two checks at the top of that page. Just take a second and look at those.
>
> A: Okay.
>
> Q: Okay. Now, I want you to accept for a moment that these are true and accurate copies of the original. You would agree with me that those two checks from [Wife's] KeyBank account indicate that there was a deposit made on May 19, 2000 of $18,000 into account number 424?
>
> A: That's what this check says.
>
> Q: And those two deposits are not recounted on your Exhibit L-1, correct?
>
> A: They are not.

{¶ 73} However, Husband has failed to provide expert evidence to demonstrate that Davis's methodology is faulty or that the purportedly "missed" deposits resulted in Davis's inability to accurately trace Wife's separate property.

And on re-direct examination, Davis testified that he reviewed the statements for every account that is in his report, with the exception of "those few Ameriprise [accounts] indicated in [his] report." He stated that he has accounted for every transaction, and with a reasonable degree of certainty, his report addressed every deposit and withdrawal for all the accounts he analyzed. (Tr. 1082.)

{¶ 74} Husband also claims that there is a two-year gap in the Vanguard records for 2006-2007, and therefore, Husband argues, "the court cannot know what assets were deposited or withdrawn" and Davis's analysis is unreliable. Husband's support for this claim is a reference to Davis's testimony:

Q: * * * I'm going to turn to document J-3 and −4. Now, it would appear that J-3 is simply a summary of all accounts, correct?

A: It's [a] summary of those three mutual funds, that's correct.

Q: Of those three mutual funds. And I don't see anything in your exhibit, John, that tells me what the activity in those funds were for that year. Am I missing something?

A: For those? Not on this statement, no. It's just showing me the total. But there's an — if there was activity, it would have been detailed out inside that report.

Q: My question to you is I can't tell from looking at J-3 whether your analysis is correct with respect to 2006 on these three Vanguard mutual funds.

A: Why not?

Q: How do I know what was — if no money came into one of these three accounts for 2006, how would I tell on J-3?

A: I didn't attach all the statements, the pages I see.

Q: So the answer is I wouldn't know?

A: The documents that were produced though would have it. We should have all those documents. * * * For some reason they are just not copied here. I don't know why.

Q: And the same is true for J-4, correct?

A: That's correct. I see that those pages are missing too.

Q: So based on your report, there is no way of verifying with a document what occurred in this Vanguard [account], these three Vanguard funds during the calendar years 2006 and 2007?

A: Not as attachments, no. My work paper file should contain all those.

(Tr. 1054-1055.)

{¶ 75} This testimony, however, does not demonstrate that a "gap" from 2006-2007 existed or that Davis failed to consider information from 2006 and 2007. While conceding that he failed to attach relevant documents from these years to the summary documents, Davis testified that the documents were produced and he in fact considered the information in his analysis. And Husband, once again, failed to provide any evidence that this alleged "gap" of information caused Davis's expert analysis to be unreliable.

{¶ 76} Husband further claims that Davis's analysis ends prior to trial and is therefore incomplete, because the court lacked information regarding deposits, withdrawals, and growth since the completion of Davis's report. The evidence shows, however, that the trial in this matter was continued four times since the court's order for expert reports, and Davis's report was likely prepared long before the ultimate trial date. Additionally, Davis reserved the right to update or amend

his report as more information became available. And once again, Husband failed to establish that this lack of information resulted in an incomplete and consequently unreliable report.

{¶ 77} Finally, Husband claims error concerning the two retirement accounts — Fidelity and Ameriprise. The evidence shows that Wife transferred the Bayless settlement funds to the Ameriprise account (tr. 1400), and the Ameriprise IRA was then rolled into the Fidelity IRA. We concluded in Husband's first assignment of error that the Bayless settlement proceeds are marital property and reversed the court's finding on this issue. To the extent that Davis attributes the Bayless funds in the retirement accounts as separate property, we reverse and remand.

### 2. Husband's Marital Labor

{¶ 78} Within this assignment of error, Husband also claims that the trial court erred in failing to find that the growth in value of the T. Rowe Price and Fidelity accounts can be attributed to Husband's marital labor.

{¶ 79} The general rule in Ohio is that income earned by labor performed during the marriage is marital property whether received during or after the marriage. *Schweinfurth v. Meza*, 8th Dist. Cuyahoga No. 80506, 2002-Ohio-6316, ¶ 19; R.C. 3105.171(A)(3)(a)(iii) ("Marital property includes * * * all income and appreciation on separate property, due to the labor * * * of either or both of the spouses that occurred during the marriage."). And where the wife established the appreciation of funds as separate property, the husband has the burden to

demonstrate that his marital labor caused the appreciation.  *See Bauer*, 12th Dist. Warren Nos. CA2019-04-033 and CA2019-04-040, 2020-Ohio-425, at ¶ 35.

{¶ 80}  Here, Husband claims that he was a licensed financial advisor throughout the first half of his marriage, he used his skills as an investment advisor to guide Wife in her investment choices, and these skills caused the appreciation in the value of the T. Rowe Price and Fidelity accounts.  He provided his own testimony that he advised Wife on how to manage her accounts and the appreciation in those accounts resulted from his involvement.  He testified that Wife did not list any financial advisor on her accounts and that he conducted periodic reviews of all of her accounts, making notes on account statements, beginning "from the time [he and Wife] spoke" until 2011, when Wife "stopped seeking [Husband's] advice." (Tr. 727-728.)   In support of his "tremendous" efforts, Husband provided a spreadsheet from one month in 2007.  Wife, however, testified that Husband was not her advisor and he had little involvement in her accounts.  She further testified that when Husband was involved, it was through his professional capacity as an employee of American Express, and he was compensated by his employer accordingly.

{¶ 81}  Additionally, Wife presented the expert testimony of John Davis, who testified concerning Wife's separate property interests in these accounts.  The court found Davis to be credible and found that Wife "met her burden to prove certain accounts were her separate property."  The court further found that Husband

"offered little evidence to rebut Davis's testimony."  Finally, the court found "the magistrate was in the best position to weigh the evidence."

{¶ 82}  In light of the foregoing, we find the court did not abuse its discretion in concluding that Husband failed to rebut Davis's expert testimony concerning Wife's traceable separate property and Husband's marital labor did not contribute to the growth of Wife's financial accounts.

{¶ 83}  Husband's second assignment of error is therefore overruled in all respects with the exception of Davis's analysis of Wife's retirement accounts.  To the extent that Davis's conclusion that Wife's IRAs are Wife's separate property is based upon his determination that the Bayless settlement proceeds contained within Wife's retirement accounts are Wife's separate property, we sustain Husband's assignment of error.

### C. The Bendemeer, Brentwood, and Edgewood Properties

{¶ 84}  In his third assignment of error, Husband claims the trial court erred in determining Wife's separate property interest in four real estate properties owned by Wife and by Wife's living trust.  On appeal, however, he provides an argument for only three of the properties:  (1) 3691 Bendemeer Road ("the Bendemeer property"); 2664 Brentwood ("the Brentwood property"); and 2547 Edgewood ("the Edgewood property").  At the time of the divorce, the properties were titled in Wife's name or in the name of her revocable trust.  Husband argues that Wife's expert real estate appraiser, Charles Flagg, improperly valued the properties.  Husband also argues

that the trial court erred in determining the extent of Wife's separate property interests.

{¶ 85} Wife purchased the Bendemeer property in June 1995 for $79,000. (Tr. 435, 561.) She made a down payment of $16,000 and obtained a 15-year loan for the remaining $63,200. (Tr. 562.) Wife owed approximately $44,867 on the house at the time of the parties' marriage in 2000. (Tr. 645-646.) Wife testified that she made monthly mortgage payments on the Bendemeer property until she paid off the balance of the loan in one lump sum, during the marriage, with the proceeds she received from the Bayless settlement. (Tr. 435, 562.) Husband likewise testified that the mortgage for the Bendemeer property was fully paid with the Bayless proceeds in 2001. (Tr. 645-46.) Wife sold this property for $135,000 during the pendency of this divorce proceeding, in violation of the court's order.

{¶ 86} The parties purchased the Brentwood property in 2002 with proceeds from the Bayless settlement. (Tr. 436, 528, 648.) Flagg testified that the Brentwood property's fair market value is $210,000.

{¶ 87} Finally, the parties purchased the Edgewood property in 2004, during the marriage. Wife testified that the parties purchased this property with the Bayless settlement proceeds. (Tr. 437, 651.) Husband testified that the Bayless settlement proceeds were used to make a deposit for both the Brentwood and Edgewood properties. (Tr. 653.) The Brentwood property was destroyed by fire in 2012. The Cuyahoga County Court of Common Pleas Court, in Cuyahoga C.P. No. CV-13-810080, determined that Husband had no insurable interest in this property,

and Wife received an insurance settlement in the amount of $149,121.08. Flagg appraised the site of the Brentwood property (vacant land) for $90,000. (Tr. 1299.)

{¶ 88} The trial court found that the Bendemeer property is Wife's separate property because she purchased the home before the marriage and she paid off the mortgage with the proceeds from the Bayless settlement, which the trial court determined was Wife's separate property. Regarding the Brentwood property, the trial court found that Wife used $53,800 of the Bayless settlement proceeds as a down payment toward the purchase of this property, and because the Bayless proceeds are Wife's separate property, Wife is entitled to the $53,800 down payment. The court further found that the appraised value of the Brentwood property was $156,200. Therefore, reducing the appraised value by Wife's down payment, the court concluded that the parties have a joint interest in the remaining $102,400 equity in the Brentwood property. Finally, the trial court awarded the Edgewood property to Wife.

{¶ 89} In light of our determination that the Bayless settlement proceeds are marital assets, we find the trial court erred in awarding to Wife the entirety of the Bendemeer property, the $53,800 down payment toward the purchase of the Brentwood property, and the entire $90,000 appraised value of the Edgewood property.

{¶ 90} Husband's third assignment of error is sustained to the extent the trial court based its award of Wife's separate property interests in the

aforementioned properties on its erroneous conclusion that the Bayless settlement proceeds are Wife's separate property.

### D. The Antisdale Property

**{¶ 91}** In his fourth assignment of error, Husband contends, without any legal authority in support, that the trial court erred in finding he had an ownership interest in 5333 Antisdale Avenue ("the Antisdale property"). Husband claims that he loaned $23,085.11 to his sister, Liliana Weiser, to help her purchase the property and his sister owns the property. Therefore, according to Husband, his marital interest in the property "at best" is $23,085.11.

**{¶ 92}** Husband testified that when he loaned his sister the money, he asked her to sign a partnership agreement providing him an interest in the house, but she refused. In support, he asserts that only an unsigned copy of the agreement was produced at trial. Husband also asserted that the property is titled in Weiser's name and she has paid all of the property taxes and utilities at the house.

**{¶ 93}** The evidence shows, however, that Husband petitioned the Cuyahoga County Probate Court, in Cuyahoga P.C. No. 2017-GRD-227666, for legal guardianship over his sister. Although Husband testified that his sister is in good health and of sound mind, Weiser did not testify at trial as to her purported ownership interest in the property. Furthermore, Wife testified that Husband used marital funds to purchase the Antisdale property.

{¶ 94} In awarding Husband the Antisdale property, which was valued at $82,500, the magistrate questioned Husband's credibility and "the true nature of [Husband's] ownership interest," stating:

> [Husband] claims he merely provided funds (approximately $23,000) to his sister, Liliana Weiser, to assist her in the purchase of this property, but that it belongs to her. [Wife], however testified that [Husband] used $70,000 of marital funds to buy the Antisdale property, and that it is actually marital.
>
> Suspiciously, [Husband] testified that his sister is in fine health physically and mentally, yet he petitioned the Cuyahoga County Probate Court * * * for legal guardianship over Weiser shortly after the trial was finished. Subsequently, [Husband] has been granted legal guardianship over his sister and all of her assets, which directly contradicts his trial testimony regarding her health.

{¶ 95} The trial court adopted the magistrate's decision regarding the Antisdale property, stating that the magistrate did not find Husband's testimony credible and based on the evidence before him, the magistrate made an equitable division of property as it relates to the Antisdale property. The court found that the magistrate was in the best position to weigh the evidence before him and the credibility of the witnesses and therefore found Husband's objection without merit.

{¶ 96} Without additional evidence to support Husband's claim that his sister owns the Antisdale property, the trial court was free to disbelieve Husband's self-serving testimony. *Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, at ¶ 56; *Deacon v. Deacon*, 8th Dist. Cuyahoga No. 91609, 2009-Ohio-2491, at ¶ 43, citing *Tokar v. Tokar*, 8th Dist. Cuyahoga No. 89522, 2008-Ohio-6467 (trial court properly rejected Husband's testimony regarding negative value of marital property

because he failed to submit independent evidence); *Smith v. Smith*, 12th Dist. Butler No. CA2001-11-259, 2002-Ohio-5449 (trial court did not abuse its discretion in rejecting Husband's claim that he used money withdrawn from savings plan on marital household expenses when Husband failed to substantiate his self-serving testimony).

{¶ 97} In light of the lack of documentary or testimonial evidence to support Husband's self-serving testimony and the magistrate's finding that Husband lacked credibility, we cannot conclude the trial court erred in finding Husband had an ownership interest in 5333 Antisdale Avenue.

{¶ 98} Husband's fourth assignment of error is overruled.

### E. Rental Properties

{¶ 99} In Husband's fifth assignment of error, he claims that the trial court erred in its valuation of seven rental properties in which he has an interest, including six properties in which Husband claims only a "fractional" interest (3259 Desota Avenue, 1534 Parkhill Road, 4208-4212 Cedar Road, 3744 Berkeley Road, 1612 Wood Road, 3675 Randolph Road) and one property that is titled in Husband's name (3316 Desota Avenue).

{¶ 100} Regarding the property titled only in Husband's name (3316 Desota Avenue), Husband argues that he had a third-party investor, I.G., and this investor demanded the return of her investment. Husband claims, therefore, that he owes I.G. $44,000. Regarding the other six properties in which Husband claims a fractional interest, Husband disagrees with Wife's expert appraisal of the properties.

Husband essentially argues, without providing his own expert opinion, that Wife's expert should not have valued the property on the basis of a single owner and that the trial court erred in accepting this valuation. Husband, however, fails to cite to any legal authority in support of his argument that the trial court erred.

{¶ 101} Under App.R. 16(A)(7), an appellant must include in its brief, under the headings and in the order indicated, "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." *Id.*; *State v. Caver*, 8th Dist. Cuyahoga Nos. 90945 and 90946, 2008-Ohio-6155, ¶ 22.

{¶ 102} An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7). *Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, at ¶ 72, citing *State v. Martin*, 12th Dist. Warren No. CA99-01-003, 1999-Ohio-App. LEXIS 3266 (July 19, 1999); *Siemientkowski v. State Farm Ins.*, 8th Dist. Cuyahoga No. 85323, 2005-Ohio-4295; *Meerhoff v. Huntington Mtge. Co.*, 103 Ohio App.3d 164, 658 N.E.2d 1109 (3d Dist.1995). We may also disregard an assignment of error where an appellant fails to cite to the record. *Najjar v. Najjar*, 8th Dist. Cuyahoga No. 91789, 2009-Ohio-3880, ¶ 9. "'If an argument exists that can support [an] assigned error, it is not this court's duty to root it out.'" *Strauss*, quoting *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028 (May 6, 1998).

**{¶ 103}** Accordingly, we decline to address Husband's fifth assignment of error.

### F. Marital Debt

**{¶ 104}** In Husband's sixth assignment of error, he contends the trial court erred in its allocation of the marital debt. In support, he argues that all of the debt he incurred during the marriage resulted from improvements to real estate and for other marital purposes. Husband asserts that this debt should therefore be presumed marital because Wife has not satisfied her burden that the debt is nonmarital. Husband also claims that the court erroneously dismissed evidence that Wife engaged in "gross misconduct" that resulted in Husband's inability to complete property renovations and repairs, pay for the properties' expenses such as utilities and taxes, and "successfully conduct" business.

**{¶ 105}** When a court divides marital property, it must take into account the parties' marital debt as well. *Chattree*, 2014-Ohio-489, 8 N.E.3d 390, at ¶ 8, citing *Kehoe*, 2012-Ohio-3357, 974 N.E.2d 1229, ¶ 14. Marital debt includes any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose. *Stratton v. Stratton*, 8th Dist. Cuyahoga No. 107798, 2019-Ohio-3279, ¶ 41, citing *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 62. Therefore, debts incurred during the marriage are presumed to be marital unless proven otherwise. *Turner v. Davis-Turner*, 8th Dist. Cuyahoga No. 106002, 2018-Ohio-2194, ¶ 12.

{¶ 106} Here, Husband claimed consumer credit card debt related to the rehabilitation of several rental/investment properties in the amount of $52,272.48. These properties include 5333 Antisdale Avenue, 3316 and 3259 Desota Avenue, 1534 Parkhill Road, 4208-4212 Cedar Road, 3744 Berkeley Road, 1612 Wood Road, and 3675 Randolph Road. Husband also claimed indebtedness to two apparent investors in some of his real estate properties — Goldschmidt ($148,000) and Genken ($44,000). According to Husband, the two investors have asked Husband to refund their investments.

{¶ 107} Regarding the indebtedness to Husband's investors, the magistrate found that Husband is the sole owner of the relevant investment properties, "since the only testimony regarding his fractional ownership of that real estate was his own" and Husband lacks "credibility and believability," which the magistrate found "problematic." The magistrate further noted:

> [Husband] provided inconsistent and conflicting testimony regarding the leases, tenants, and rents he collects for the [rental] properties, as well as their respective conditions. [Husband] claimed multiple vacant properties will require more repairs before he can rent them out. In contrast, however, he also testified extensively and in specific detail about the rehabilitation work he has performed on them.
>
> [Husband] also claims his interests in the above-mentioned properties are frequently "fractional," based on his relationships with several investors, including * * * Goldschmidt and * * * Genken. [Husband] testified about the existence of several entities and/or retirement accounts which possess ownership interests in these properties, including for example, Gavaldig, A-1 Development, Tomorning, FCI Global, and perhaps others.
>
> To describe the intertwined nature of these purported investors and business entities and retirement accounts with [Husband's] financial affairs as confusing would be an understatement. Despite

[Husband's] claim he is merely a part owner of these properties, his tax returns indicate he claims 100 percent of the income from the rental properties and deducts 100 percent of the expenses. He also testified he will be reimbursed the $52,272.48 in credit card [debt] he exclusively accrued for the renovation of the properties from the rental income.

{¶ 108} The magistrate therefore concluded that Husband is solely responsible for disposing of the claims of Goldschmidt and Genken.

{¶ 109} Regarding the consumer credit card debt related to the rehabilitated properties, the magistrate found that Husband's testimony regarding the condition of the properties, "together with his refusal to allow the appraisers inside for evaluations and his admitted lack of motivation to find paying tenants, leads the Court to infer [Husband] has intentionally refused to lease these rental properties as a means of artificially decreasing his income while the case is pending." The magistrate therefore concluded that Husband is solely responsible for the balance on any personal credit cards in his name, including the credit card consumer debt of $52,272.48, "which [Husband] testified is exclusively attributable to the rehabilitation and/or maintenance of the [properties awarded to Husband]."

{¶ 110} Finally, the magistrate found that the parties would be solely responsible for any other consumer debt, including credit cards and lines of credit, held in their own respective names. Specifically, the magistrate determined that Husband is solely liable for his KeyBank cash reserve line of credit (#2679, $4,899.83) and KeyBank line of credit (#5818, $9,710.37), and Wife is solely liable for the following credit cards: British Airways (#2242, $95.00), Nordstrom (#184, $48.60), Citicards (#7940, $1,972.71), and American Express ($8,360.15).

{¶ 111} We find the magistrate's allocation of the parties' debt is supported by the record. None of Husband's purported investors testified concerning their investments, nor was any evidence provided other than Husband's own self-serving testimony. Moreover, the magistrate found Husband lacked credibility, specifically noting Husband's "inconsistent and conflicting testimony." And we defer to the trier of fact to determine the credibility of the witnesses, including resolving any inconsistencies. *Allan v. Allan*, 8th Dist. Cuyahoga No. 107142, 2019-Ohio-2111, ¶ 80, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

{¶ 112} Accordingly, under the facts of this case, and in light of the magistrate's finding that Husband lacked credibility, we cannot say the court's distribution of the parties' debt was inequitable.

{¶ 113} Husband's sixth assignment of error is overruled.

G. Spousal Support

{¶ 114} In his seventh assignment of error, Husband contends that the trial court's failure to award Husband spousal support is an abuse of discretion. In support, he argues that the statutory factors supported such an award in his favor.

{¶ 115} A trial court has broad discretion in awarding spousal support. *Williams v. Williams*, 8th Dist. Cuyahoga No. 103975, 2016-Ohio-7487, ¶ 9; *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990) (stating that a trial court has broad discretion in deciding "what is equitable upon the facts and circumstances of each case"). However, in making a determination concerning "whether spousal

support is appropriate and reasonable, and in determining the nature, amount, and terms of payment," as well as the "duration of spousal support," the court must consider the statutory factors. R.C. 3105.18(C)(1); *Woyt*, 8th Dist. Cuyahoga Nos. 107312, 107321, and 107322, 2019-Ohio-3758, at ¶ 39.

{¶ 116} These spousal support factors include: the parties' income, the relative earning abilities, the ages and physical and mental conditions of the parties, retirement benefits, duration of the marriage, the custodial status of a party concerning a minor child of the marriage, standard of living, the parties' education, the parties' assets and liabilities, time and expense necessary for a spouse's job training, tax consequences, a party's lost income production resulting from that party's marital responsibilities, and a party's contribution to the other party's education or acquisition of a professional degree. R.C. 3105.18(C)(1)(a)-(m). Additionally, the court may consider "any other factor it expressly finds 'relevant and equitable.'" *Id.*, quoting R.C. 3105.18(C)(1)(n).

{¶ 117} A trial court does not abuse its discretion in awarding spousal support where the court's order is supported by competent, credible evidence. *Woyt* at ¶ 40, citing *Deacon*, 8th Dist. Cuyahoga No. 91609, 2009-Ohio-2491, at ¶ 14. Although the trial court need not comment on each statutory factor, the record should demonstrate that the court considered the factors when making its award. *Saks v. Riga*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, ¶ 65. A reviewing court will affirm an award of spousal support "so long as the record reflects that the trial court considered the requisite statutory factors, and the judgment contains

sufficient detail for us to determine that the award is fair, equitable, and in accordance with the law." *Woyt* at ¶ 40, citing *Chattree*, 2014-Ohio-489, 8 N.E.3d 390, at ¶ 71.

{¶ 118} Husband argues that he should be awarded spousal support because he was 66 years old at the time of the trial, he was too young to collect social security, and he was unemployed. He claims that he stopped working as a financial advisor, allowing his license to lapse, in order to manage the rental properties and care for their then-minor child. Husband also argues that Wife destroyed his reputation, she is younger and more educated than he, and Wife has a longer work life.

{¶ 119} Here, in his decision concerning spousal support, the magistrate noted the "inherent difficulties in imputing income" to the parties in this divorce. Indeed, the magistrate found: both Husband and Wife are voluntarily unemployed; Husband appears to be "waiting until the case is complete to [secure tenants for his rental] properties as a means to artificially suppress his actual present earning capacity"; and because Husband "has refused access to his properties and has provided no credible evidence to show his actual income since at least 2014," imputed income of $100,000, representing approximately 55 % of the total income Husband would earn for the rented properties at the Husband's suggested amounts, is reasonable under the circumstances. The magistrate then stated that he considered R.C. 3105.18(B) and the factors set forth in R.C. 3105.18(C)(1) and (2) and concluded that spousal support "is neither appropriate nor reasonable" under the circumstances.

**{¶ 120}** In adopting the magistrate's decision, the trial court found the magistrate was in the best position to weigh the evidence and the magistrate in fact applied the relevant statutory factors to his determination concerning spousal support. The court further found that Husband's claim that Wife caused Husband lost business opportunities was unsupported, and despite Husband's "evasiveness and lack of credibility creating a challenge for the magistrate when determining [Husband's] income," the magistrate reviewed all the evidence and properly imputed income to Husband.

**{¶ 121}** Regarding Husband's income, the trial court further stated:

[Husband] testified he was a former financial advisor and "self-employed in the real estate business." He also claimed to be a consultant and property manager. The evidence overwhelmingly supported a finding that [Husband] was voluntarily unemployed. After considering the relevant factors * * *, the magistrate determined an annual income of $100,000 should be imputed to [Husband]. This figure represents approximately 55% of the total income [Husband] would earn from his rental properties if each property was being rented for the amounts that [Husband] has suggested for each unit respectively. The court finds the magistrate was in the best position to weigh the evidence before him.

**{¶ 122}** Moreover, the record demonstrates that at the time of trial, Husband was less than one month from meeting the full retirement age of 66 years, and Husband needed two employment credits to meet the minimum income requirements of social security in order to receive social security benefits. Yet Husband failed to obtain those credits, choosing instead to wait:

Q: If you really wanted to find a way to get those two credits, you could have found a way to get those two quarters of credits for social security, right?

A: Yeah. * * * I don't intend to take social security until I'm 70 because I would be receiving a much higher amount. * * * It's a financial decision. It's in my best interest to wait until I'm 70.

{¶ 123} In light of the foregoing, we cannot find the trial court abused its discretion in failing to award spousal support to Husband. The judgment contains sufficient detail demonstrating that the court's decision not to award spousal support to Husband is fair, equitable, and in accordance with the law.

{¶ 124} Husband's seventh assignment of error is overruled.

## H. Contempt Motions

{¶ 125} In his eighth assignment of error, Husband claims the trial court erred in failing to find Wife in contempt following Husband's motions filed on July 1, 2016, July 29, 2016, and July 28, 2017. Within this assignment of error, Husband essentially summarizes each motion, arguing that the evidence shows Wife should have been found in contempt for numerous reasons. Husband fails, however, to cite any legal authority in support of his argument that the trial court erred. We therefore decline to address Husband's eighth assignment of error. *See Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, at ¶ 72, citing *Martin*, 12th Dist. Warren No. CA99-01-003, 1999 Ohio App. LEXIS 3266; *Siemientkowski*, 8th Dist. Cuyahoga No. 85323, 2005-Ohio-4295; *Meerhoff v. Huntington Mtge. Co.*, 103 Ohio App.3d 164, 658 N.E.2d 1109 (3d Dist.1995).

## I. Attorney Fees

{¶ 126} In his ninth assignment of error, Husband generally, and with virtually no legal authority in support of his argument, contends the trial court erred in failing to award him attorney fees. Citing only to "the factors in [R.C.] 3105.73," Husband claims that he should have been awarded attorney fees because (1) his lawyer expended more time on complex issues "that served Wife's interests only," including the tracing of Wife's separate financial accounts, Wife's interest in the Bendemeer, Edgewood, and Brentwood properties, and Wife's claim that the Bayless proceeds are her separate property; and (2) Wife engaged in "egregious misconduct," including Wife's "campaign of slander," her violations of court orders, and her transfer of marital funds to Wife's daughter.

{¶ 127} We note initially that "there are 'no automatic attorney fees' in domestic relations cases." *Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, at ¶ 100, quoting *Packard v. Mayer-Packard*, 8th Dist. Cuyahoga No. 85189, 2005-Ohio-4392, ¶ 8. And when determining whether to award attorney fees in divorce cases, "the court must start with a presumption that attorney fees are the responsibility of the party who retains the attorney." *Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 33.

{¶ 128} A court may award reasonable attorney fees if it determines that the award is equitable. *Allan*, 8th Dist. Cuyahoga No. 107142, 2019-Ohio-2111, at ¶ 100. In determining whether attorney fees are equitable, the court may consider the factors set forth in R.C. 3105.73(A). *Id.* This statute, which governs attorney fees in

divorce proceedings, provides that a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 129} While the statute enumerates factors that the trial court may consider, the statute also permits the trial court to consider any other factors it deems appropriate. *Iacampo v. Oliver-Iacampo*, 11th Dist. Geauga No. 2011-G-3026, 2012-Ohio-1790, ¶ 149. The court is not required to make any specific findings regarding attorney fees. *Welty v. Welty*, 11th Dist. Ashtabula Nos. 2007-A-0013 and 2007-A-0015, 2007-Ohio-5217, ¶ 41. And an award of attorney fees is within the sound discretion of the trial court and its award will not be overruled absent an attitude that is unreasonable, arbitrary, or unconscionable. *Cyr v. Cyr*, 8th Dist. Cuyahoga No. 84255, 2005-Ohio-504, ¶ 70, citing *Rand v. Rand*, 18 Ohio St.3d 356, 359, 481 N.E.2d 609 (1985).

{¶ 130} Regarding attorney fees, the magistrate found it equitable for the parties to be responsible for their respective attorney fees, and the court adopted the magistrate's decision with respect to the magistrate's finding. The record demonstrates that both parties have assets and income to pay their own attorney fees, both parties engaged in obstructive behavior or other misconduct, and Husband elected not to retain an expert to rebut Wife's tracing expert or to trace his own purported separate property, which arguably frustrated the proceedings.

Additionally, the record shows that the magistrate repeatedly addressed Husband's lack of credibility throughout his decision.

{¶ 131} Moreover, the court addressed Wife's purported misconduct when it granted Husband's motion to show cause, finding Wife in contempt:

> [T]he court finds [Wife] did withdraw funds from multiple accounts in violation of the mutual restraining orders issued in this case. However, the court is unable to determine the exact amount attributable to these violations. More egregious is [Wife's] conduct with respect to [Wife's actions in selling the Bendemeer property] in violation of the mutual restraining orders, and that she absolutely knew she was not permitted to sell that property, but did so nonetheless. The fact [Wife] testified about this parcel at trial after she had sold it, yet made no mention of the sale, is the best evidence of her consciousness of guilt as it relates to this violation. The court finds it unreasonable to conclude that significant detail merely slipped [Wife's] mind.
>
> As a result of Wife's contempt, the court awarded Husband the $50,000 Bendemeer proceeds Wife had already advanced Husband as a sanction for her conduct, awarding the sum to Husband "as compensation for the funds [Wife] knowingly withdrew in violation of the mutual restraining orders and as sanction for her multiple contempt findings * * *.
>
> Regarding Husband's request that Wife pay him $5,000 for attorney fees he incurred to litigate the foregoing show cause motions, the magistrate noted Wife's request that Husband pay $10,000 for attorney fees she incurred in order to access a safe deposit box Husband failed to disclose and refused to provide access to and stated as follows:
>
> The court finds it is equitable for the parties to bear all of these costs themselves. The additional roughly $5,000 [Wife] incurred for fees in this equation shall be credited against her as further sanction for her early withdrawal of funds in violation of the mutual restraining orders as discussed above.

{¶ 132} In light of the foregoing, we cannot find the trial court abused its discretion in not awarding Husband attorney fees.

{¶ 133} Husband's ninth assignment of error is overruled.

### J. Child Support

{¶ 134} In his tenth assignment of error, Husband claims the trial court's child support order is an abuse of discretion.

{¶ 135} In support of his argument that the trial court erred, Husband asserts that the court's order is based upon "$100,000 of non-existent income" and provides five "reasons," including his age and "very little" income and Wife's misconduct and her "income-generating" separate property that the magistrate allegedly did not consider. Husband, however, provides no citation to portions of the transcript and, once again, fails to cite any legal authority to support his argument. Under the authority cited above, we therefore decline to address Husband's tenth assignment of error.

### K. Shared Parenting Plan

{¶ 136} In his eleventh assignment of error, Husband claims that the court erred in adopting the GAL's proposed shared parenting plan. Husband concedes, however, in his reply brief that this issue is now moot because the parties' child is now emancipated. We therefore find this alleged error moot and decline to consider it.

L.  Division of Marital Estate

{¶ 137} In his twelfth and final assignment of error, Husband claims the trial court abused its discretion when it failed to order a distributive award in order to effectuate an equitable division of the marital estate.  In support of his argument, Husband cites only to the trial court's authority under R.C. 3107.171(E) to make such an award and claims that the evidence "established the massive financial misconduct in which Wife had engaged."

{¶ 138} R.C. 3105.171(E)(1) permits a trial court to make a distributive award to "facilitate, effectuate, or supplement a division of marital property."  Under R.C. 3105.171(E)(4), "if a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."  A spouse commits "financial misconduct" where he or she "engages in intentional conduct by which he or she either profits from the misconduct or intentionally defeats the other spouse's interest in marital assets.  *Rodgers v. Rodgers*, 8th Dist. Cuyahoga No. 105095, 2017-Ohio-7886, ¶ 30; *Best v. Best*, 10th Dist. Franklin No. 11AP-239, 2011-Ohio-6668, ¶ 17 (stating that financial misconduct occurs when one spouse intentionally interferes with the other spouse's property rights).  The offended spouse bears the burden of proving the financial misconduct.  *Id.*

{¶ 139} "'The distributive award concept is consistent with the well-established principle that trial courts have broad discretion when creating an

equitable division of property in a divorce proceeding.'" *Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, at ¶ 39, quoting *Adams v. Chambers*, 82 Ohio App.3d 462, 466, 612 N.E.2d 746 (12th Dist.1992), citing *Teeter v. Teeter*, 18 Ohio St.3d 76, 479 N.E.2d 890 (1985). Thus, a trial court has broad discretion in determining whether a distributive award is equitable and appropriate under R.C. 3105.171(E). *Gentile v. Gentile*, 8th Dist. Cuyahoga No. 97971, 2013-Ohio-1338, ¶ 55; *Tilmant v. Tilmant*, 5th Dist. Knox No. 2004CA000024, 2005-Ohio-5939, ¶ 21, citing *Adams*. And a reviewing court may reverse a trial court's division of property only upon a showing of an abuse of that discretion. *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140.

{¶ 140} In overruling Husband's sixteenth objection to the magistrate's decision, the trial court found that the magistrate was not required to make a distributive award. The court stated that the magistrate sanctioned Wife for alleged financial misconduct and found "it would be unreasonable to subject [Wife] to both sanctions and make a distributive award for the same alleged violations." The court then concluded that the magistrate made an equitable division of property based upon the evidence before him, and it overruled Husband's objections.

{¶ 141} Husband claims on appeal that Wife engaged in several acts of financial misconduct, including a withdrawal of $150,274.93. Wife testified, however, that she withdrew these funds on the same day that she received the complaint for divorce and did not understand the significance of the documents because she had no legal representation at the time. Wife further testified that she

redeposited $148,775.93 less than one week after withdrawing the funds. Husband also claims that Wife engaged in financial misconduct by issuing a check in the amount of $100,000 to Wife's daughter. Wife testified, however, that her daughter returned those funds. Husband claims that Wife paid $45,000 for her daughter's wedding and "Husband was not invited to the wedding, although marital funds had been used." Husband fails to demonstrate, however, that this expenditure is financial misconduct.

{¶ 142} Husband claims that several other checks purportedly issued by Wife for Wife's daughter's college expenses and minor son's school expenses are evidence of Wife's financial misconduct. Husband fails to demonstrate that these expenditures were the deliberate dissipation or fraudulent disposition of marital assets made with the intent to defeat Husband's interest in the marital assets.

{¶ 143} Finally, Husband claims that Wife engaged in "significant divorce planning," had not spoken to Husband since 2011-2012, consulted with "several divorce lawyers prior to being served with the divorce complaint," and paid an attorney $900 in 2015. Husband fails to show how Wife's consultation with divorce attorneys and her failure to speak with Husband is financial misconduct.

{¶ 144} Moreover, the record demonstrates that where the magistrate found Wife had engaged in misconduct, he sanctioned her. As discussed previously in this opinion, the magistrate sanctioned Wife for withdrawing funds and for selling the Bendemeer property in violation of the mutual restraining orders by awarding

Husband the $50,000 Wife had already advanced Husband from the Bendemeer proceeds.

{¶ 145} In light of the foregoing, and upon a thorough review of the record, we cannot find the trial court abused its discretion in failing to order a distributive award. Husband's twelfth assignment of error is overruled.

V. Wife's Cross-appeal

A. Wife's Supplemental Objections

{¶ 146} In Wife's first cross-assignment of error, she claims the trial court abused its discretion in prohibiting her from filing supplemental objections to the magistrate's decision on the basis that she failed to file a praecipe. In support, Wife argues that she gave notice of her intent to file supplemental objections as required when she filed her preliminary objections, and Husband had already filed a praecipe.

{¶ 147} Pursuant to Civ.R. 53(D)(3)(b)(iii), a party that files timely objections to a magistrate's decision prior to the date on which a transcript is prepared "may seek leave of court to supplement the objections." Loc.R. 27(1)(c) of the Cuyahoga County Domestic Relations Court provides that "[a] party filing objections that require a transcript must file his or her objections within the fourteen (14) day time period * * *, and must file a Notice of Intent to supplement objections after the transcript has been completed, for which leave will automatically be granted." If a party is objecting to factual findings in the Magistrate's decision, a transcript of the record of proceedings must be filed. Loc.R. 27(2)(a). And under

the local rules, the party filing objections must order the transcript and file a praecipe "within the initial fourteen (14) day period after the date the magistrate's decision is filed." Loc.R. 27(2)(c). The failure to timely file the praecipe "shall result in the objections as to factual findings being overruled." Loc.R. 27(2)(f).

{¶ 148} Here, on April 30, 2018, Wife filed timely objections to the magistrate's decision, entitled "Defendant's Preliminary Objections to Magistrate's Decision." In that same document, Wife filed a "Motion for Extension of Time to Submit Supplemental Objections." Within the motion, Wife stated:

> Pursuant to Civ.R. 53 and Local Rule 7, Defendant hereby reserves her right to file Supplemental Objection to the within the matter. Defendant respectfully requests 45 days after the filing of the transcript to supplement her Objections with additional arguments or to remove arguments made based upon the transcript and review of the evidence. As the Court is aware, Defendant's prior counsel recently withdrew from this matter and successor counsel, having literally just filed his Notice of Appearance in this matter, needs time to review the file and the pleadings and the Decision prior to Supplementing the Objections.

{¶ 149} Thereafter, also on April 30, 2018, the trial court granted Wife's former counsel's motion to withdraw as counsel of record, and Wife's new counsel filed a notice of appearance. On May 14, 2018, the court addressed Wife's motion for extension of time to submit supplemental objections filed on April 30, stating as follows:

> Pursuant to Loc.R. 27, [Wife] has fourteen (14) days following the completion of the transcript and the filing of the notice of availability of transcript, to file her supplemental objections. As the transcript has not yet been prepared, the pending motion for an extension of time is premature. Should [Wife] require additional time beyond the

fourteen (14) days to file her supplemental objections, she must follow the procedures outlined in Local Rule 27.

{¶ 150} Following several intervening motions, on June 11, 2018, Wife filed a motion for extension of time to submit supplemental objections and to respond to Husband's supplemental objections. On June 15, 2018, however, the court issued an order denying Wife's motion, stating, "[Wife] is not permitted to file supplemental objections, as she did not file a praecipe []or a notice [of intent] to supplement objections."

{¶ 151} We find that although Wife did not caption her motion filed on April 30, 2018, as a "Notice of Intent to Supplement Objections," in accordance with Loc.R. 27(1)(c), this motion undoubtedly provided sufficient notice to the court of Wife's intent to file supplemental objections. Within this motion, Wife expressly stated that she "reserved" her right to file supplemental objections. Indeed, the record demonstrates that the court was aware of Wife's intent to file supplemental objections when it advised her on May 14, 2018, that her motion for an extension of time to file supplemental objections was "premature."

{¶ 152} Moreover, the record demonstrates that Husband filed a praecipe requesting a transcript on April 19, 2018. The local rules provide that if a party is objecting to factual findings in a magistrate's decision, he or she must file a transcript of the proceedings, if one is available. Loc.R. 27(2)(a). And as previously stated, in order to obtain the transcript, the party filing objections must file a praecipe requesting the court reporter prepare the transcript. Loc.R. 27(2)(c). The local rules do not expressly require that each objecting party file a praecipe. And

because the purpose of the praecipe is to order a transcript of the proceedings to be filed with the court, so that the magistrate may properly review the facts set forth in the transcript, the filing of a second praecipe would be redundant.

{¶ 153} Under the foregoing circumstances, we find the trial court's order in prohibiting Wife from filing supplemental objections was arbitrary and unreasonable. Although Wife filed numerous preliminary objections that extensively addressed the magistrate's findings, and we are hard-pressed to discern what objections remain to be made, we are constrained to find the trial court abused its discretion.

{¶ 154} Wife's first cross-assignment of error is sustained.

B. Motion to Intervene

{¶ 155} In Wife's second cross-assignment of error, she contends the trial court erred when it granted her former counsel's motion to intervene in the action. In support, Wife claims that the court's order permitting the law firm of Skirbunt & Skirbunt L.L.C. to intervene in the pending divorce action allowed Skirbunt to assume a position directly adverse to its former client.

{¶ 156} We note initially that Skirbunt filed a "notice of intent to brief" with this court on April 10, 2019, which Wife opposed, arguing that Skirbunt lacked standing to file a brief. Because we find Skirbunt's notice an appropriate vehicle in which to protect its interests in its attorney fees, we consider Skirbunt's argument on appeal.

{¶ 157} Skirbunt represented Wife during the trial. Thereafter, in his decision issued on April 5, 2018, the magistrate determined that, aside from attorney fees relating to the parties' contempt and "general misconduct," Husband and Wife would be responsible for their own respective attorney fees. The magistrate found the parties' respective attorney fees "to be both reasonable and appropriate under the circumstances, and based on the evidence presented at trial." On April 16, 2018, the trial court ordered the payment of $54,269.83 to Husband's attorneys and $44,262.40 to Skirbunt. On April 27, 2018, Skirbunt filed a motion to withdraw as counsel, which the court granted on April 30, 2018. On May 8, 2018, Wife filed a motion to partially vacate the court's order of April 16 and a motion to stay disbursement and for temporary restraining orders, arguing that she was engaged in a fee dispute with Skirbunt. Skirbunt denies this claim. On May 15, 2018, Skirbunt filed a motion to intervene pursuant to Civ.R. 24(A)(2), claiming a third-party interest in the outcome of the trial. On May 30, 2018, the trial court granted Skirbunt's motion to intervene. Skirbunt then, as a third-party defendant, filed a brief in opposition to Wife's motion to vacate. On January 28, 2019, the trial court issued its final divorce decree, reiterating its adoption of the magistrate's decision concerning the parties' respective attorney fees.

{¶ 158} The granting or denial of intervention is discretionary and will not be disturbed on appeal without a showing that the trial court abused its discretion. *Likover v. Cleveland,* 60 Ohio App.2d 154, 158-159, 396 N.E.2d 491 (8th Dist.1978).

**{¶ 159}** Under Civ.R. 24(A), intervention as of right, one shall be permitted to intervene in an action

> when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Civ.R. 24(A)(2).

**{¶ 160}** Although intervention as a matter of right is to be liberally construed in favor of the putative intervenor, the intervenor must establish all of the following requirements under Civ.R. 24(A)(2):

> "(1) the intervenor must claim an interest relating to the property or transaction that is the subject of the action; (2) the intervenor must be so situated that the disposition of the action may, as a practical matter, impair or impede the intervenor's ability to protect his or her interest; (3) the intervenor must demonstrate that his or her interest is not adequately represented by the existing parties; and (4) the motion to intervene must be timely."

*Cleveland v. State*, 8th Dist. Cuyahoga No. 92735, 2009-Ohio-6106, ¶ 6, quoting *Fairview Gen. Hosp. v. Fletcher*, 69 Ohio App.3d 827, 830-831, 591 N.E.2d 1312 (10th Dist.1990), quoting *Blackburn v. Hamoudi*, 29 Ohio App.3d 350, 505 N.E.2d 1010 (10th Dist.1986), syllabus.

**{¶ 161}** In Ohio, however, in the absence of a statute, third persons generally do not have a right to intervene in a divorce action. *Rielinger v. Rielinger*, 8th Dist. Cuyahoga No. 90614, 2009-Ohio-1236, ¶ 68, citing Civ.R. 75(B); *Maher v. Maher*, 64 Ohio App.2d 22, 410 N.E.2d 1260 (6th Dist.1978) (citations omitted). "Indeed, the object of Civ.R. 75(B) is to prevent the intervention of a third-party to a divorce

action." *Chrisman v. Chrisman*, 12th Dist. Warren No. CA99-01-006, 2000 Ohio App. LEXIS 937, 5, citing *Foster v. Foster*, 9th Dist. Medina No. 1735, 1989 Ohio App. LEXIS 57, 5 (Jan. 11, 1989) (affirming the trial court's denial of an attorney's motion to intervene for attorney fees because a "contract between attorney and client is to be litigated and reviewed in an action separate from the divorce action").

{¶ 162} Outlining the circumstances that permit intervention in divorce cases, Civ.R. 75(B) provides as follows:

> Civ.R. 14, 19, 19.1, and 24 shall not apply in divorce, annulment, or legal separation actions, however:
> (1) A person or corporation having possession of, control of, or claiming an interest in property, whether real, personal, or mixed, out of which a party seeks a division of marital property, a distributive award, or an award of spousal support or other support, may be made a party defendant;
> (2) When it is essential to protect the interests of a child, the court may join the child of the parties as a party defendant and appoint a guardian ad litem and legal counsel, if necessary, for the child and tax the costs;
> (3) The court may make any person or agency claiming to have an interest in or rights to a child by rule or statute, including but not limited to R.C. 3109.04 and R.C. 3109.051, a party defendant;
> (4) When child support is ordered, the court, on its own motion or that of an interested person, after notice to the party ordered to pay child support and to his or her employer, may make the employer a party defendant.

{¶ 163} Therefore, third parties may intervene when "'they have a claim or interest in property involved in the divorce action, which claim or interest may be adversely affected by the divorce proceeding.'" *Chrisman*, quoting *Maher* at 22.

{¶ 164} Here, Skirbunt does not have an interest in the marital property. Rather, its interest is only in recovering its own attorney fees. And Skirbunt has an

alternate means to protect its interests in the form of civil litigation to collect its fees. *Foster.*

{¶ 165} We therefore find the trial court abused its discretion in allowing Skirbunt to intervene in the divorce proceeding to collect its attorney fees.

{¶ 166} Wife's second cross-assignment of error is sustained.

### C. Attorney Fees

{¶ 167} In her third cross-assignment of error, Wife claims the trial court erred when it issued a "sua sponte award of attorney fees with no such motion pending, after the magistrate's decision but before the judgment of entry of divorce." Because Wife's argument is completely devoid of citations to portions of the transcript or any legal authority in support of her position, we decline to address it. *Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 72, citing *Martin*, 12th Dist. Warren No. CA99-01-003, 1999 Ohio App. LEXIS 3266 (July 19, 1999); *Najjar*, 8th Dist. Cuyahoga No. 91789, 2009-Ohio-3880 at ¶ 9.

### D. Penalty for Wife's Violation of Restraining Orders

{¶ 168} In her fourth cross-assignment of error, Wife claims the trial court erred by imposing a sanction of $50,000. Although Wife initially states that the trial court "abused its discretion when it imposed 100 hours of community service and a $50,000 penalty" for her alleged violation of the mutual restraining orders by selling the Bendemeer property, her assignment of error is directed only at the $50,000 sanction. Indeed, the only legal authority cited within the entire assignment is *Robiner v. Robiner*, 8th Dist. Cuyahoga No. 67195, 1995 Ohio App. LEXIS 5425

(Dec. 7, 1995), in which this court found the trial court did not abuse its discretion when it determined that money spent by the wife in violation of a restraining order was offset by the husband's failure to pay temporary spousal support, and therefore, the husband was not entitled to reimbursement. We therefore will only address the $50,000 sanction here.

{¶ 169} Wife argues that the Bendemeer property was premarital and she did not know that the restraining order "prevented her from having control over her own pre-marital property."

{¶ 170} When a party violates the terms of a restraining order, the court has the discretion to make a distributive award to the party aggrieved by the violation of the restraining order or compensate the offended spouse with a greater award of marital property. R.C. 3105.171(E)(4); *Rodgers*, 8th Dist. Cuyahoga No. 105095, 2017-Ohio-7886, at ¶ 30.

{¶ 171} Here, the magistrate found Wife in contempt of the court's restraining orders where she sold the Bendemeer property and withdrew funds "from multiple accounts." And in awarding the sanction, the magistrate found Wife's actions especially egregious in light of the fact that Wife testified about the Bendemeer property at trial after she sold the property, yet "she made no mention of the sale." The magistrate found this behavior "the best evidence of her consciousness of guilt" and "unreasonable to conclude that significant detail merely slipped [Wife's] mind."

**{¶ 172}** Additionally, although Wife claims on appeal that she was not aware that she could not sell "her own pre-marital property," Wife's own testimony belies that fact. When questioned about the Bendemeer sale, Wife explained that she was approached by potential buyers, but she initially told them, "I'm going through a divorce and, you know, I cannot sell it right now." But, as she testified, the buyers pressured her to make the sale and she acquiesced: "So I told my tenant until trial is over, I'm not — I don't want to go through [with a] transaction. And then in February, [the buyers] approached me again and they said to me that 'we are going to go move forward with a purchase of [another] property.'" At the time of the sale, the divorce proceedings were ongoing, the temporary restraining orders were in place, and Wife acknowledged that she was aware that some of her assets were "frozen." Moreover, the Bendemeer property was purchased with the Bayless settlement proceeds, and the determination of whether these proceeds were separate or marital property was in fact the subject of the divorce litigation. Wife therefore could not reasonably assume that the Bendemeer property was her separate property at the time of the sale. In adopting the magistrate's decision, the court found that the magistrate was in the best position to weigh the evidence.

**{¶ 173}** In light of the foregoing, we cannot find the court's sanction of $50,000 against Wife was an abuse of discretion.

**{¶ 174}** Wife's fourth cross-assignment of error is overruled.

E. Credit for Attorney Fees and GAL Fees

{¶ 175} In Wife's fifth cross-assignment of error, she claims the trial court abused its discretion when it failed to credit her for advancing $77,000 of attorney fees to Husband's counsel and for Wife's payment of $20,000 of GAL fees. She contends that she made these payments and they were not factored into the division of marital assets and liabilities.

{¶ 176} Wife objected to the magistrate's decision on the foregoing basis. In overruling her objection, the trial court stated in the divorce decree as follows:

> In [Wife's] second objection, she argued the magistrate erred and abused his discretion when he failed to credit [Wife] for advancing attorney fees totaling $77,000.00 to [Husband's] counsel, and for paying all of the GAL fees totaling $20,000 in the final calculation of the division of the parties' assets and liabilities. [Wife] claimed the court erred upon failing to either credit her for these payments or to reallocate them in the financial calculation of the division of the parties' assets and liabilities and property. A review of the docket reveals in the judgment entry journalized on August 1, 2016, the court ordered an equal allocation between the parties for GAL fees. As discussed previously, the magistrate found the Bendemeer property was sold in violation of the temporary restraining order. In the judgment entry journalized on July 14, 2017, this court allocated proceeds from the sale of the Bendemeer property for [Husband's] attorney fees, [Wife's] attorney fees, and a portion for mutual GAL fees. [Wife] did not present any evidence to support her argument [that] she paid $77,000 toward [Husband's] attorney fees. There is nothing in the [Wife's] argument to show there was an order by this court for her to pay $77,000 toward [Husband's] attorney fees. [Wife] failed to establish she paid all the GAL fees.

{¶ 177} As it relates to Wife's argument concerning attorney fees, however, on September 29, 2016, the trial court ordered Wife to pay Husband's attorney fees as an advance against the eventual property division awarded to Husband as follows:

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Ex Parte Temporary Restraining Order dated August 17, 2015 be and hereby is released such that Fidelity Investments shall issue a check payable to Cavitch, Familo & Durkin in the sum of $77,731.83 of which $27,142.85 is currently due and payable and $50,588.98 shall be further retainer for attorney fees and expenses relative solely to the law offices representation of [Husband] in the within matter. * * *

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the distribution to Cavitch, Familo Durkin shall be an advance against the ultimate property division awarded to [Husband] and, further, that [Husband] shall not be prevented from making any arguments relative to the final allocation of the $77,731.83 in this matter.

{¶ 178} Moreover, the record supports Wife's contention that the attorney fees were in fact paid and they served as an advance against Husband's property division. On cross-examination, Husband's counsel, Roger Kleinman, acknowledged receipt of payment for attorney fees:

Q: And do I have that right that through August 31, 2017, your fees were $125,265.12?

A: That was the unpaid portion.

Q: Okay. And that was through the end of trial, correct?

A: Correct.

Q: The amounts that you have received as advances against your client's property division, you received the sum of $77,731.83 on September 29, 2016, correct?

A: Correct.

(Tr. 1611.)

{¶ 179} In light of the above, the record establishes that the trial court did indeed order Wife to pay $77,731.83 to Husband's attorney as an advance against

Husband's interest in the property division.  And the record further establishes that Wife paid these fees. The court's failure to credit Wife with the payment is therefore an abuse of discretion.

{¶ 180} Wife also claims that she paid all of the $20,000 GAL fees and the court's failure to credit her with the same was error.

{¶ 181} On August 1, 2016, in an agreed judgment entry, the parties agreed to pay equal shares of the GAL fees:

> It is further ordered, adjudged, and decreed that the parties shall each make regular payments, upon presentation of the invoices of the GAL, for one-half of the fees as billed ([Husband] shall pay one-half and [Wife] shall pay one-half), which fees shall be subject to the court's ability to entertain an application by any party for a different allocation of those fees between the parties.

{¶ 182} And within this order, the trial court ordered that "monies to pay GAL ($5,000) shall be released from Wife's KeyBank account which was the subject of [a] prior hearing before the magistrate."

{¶ 183} In support of her claim that she paid all of the fees, rather than her equal share, Wife cites to her own testimony at trial in which she testified on direct examination concerning payment to the GAL:

> Q:  Did you write a check to cover the fees of [the GAL] and payable to * * * the IOLTA account of my law firm?
>
> A:  Right.  And I paid you.
>
> Q:  Did you write a check to my firm?
>
> A:  Yes.
>
> Q:  All consistent with the court's order, correct?

A: Absolutely. * * *

(Tr. 1343.)

**{¶ 184}** This testimony, however, does not establish that Wife paid the GAL fees of $20,000. In fact, the GAL testified that he "received a check by agreement of the parties — I don't know who [it] came from, that was a partial release of a restraining order back in the late summer of 2016." (Tr. 1594.) And the GAL's fourth motion and application for fees (GAL's exhibit No. 1) includes a single payment of $5,000 made on August 29, 2016. Therefore, at most, the record establishes that Wife paid $5,000 to the GAL, which is far short of the total GAL fees of $20,000 Wife claims she paid.

**{¶ 185}** In light of the foregoing, Wife has failed to demonstrate that, despite the court's order that the parties pay their equal share, she paid all of the GAL fees amounting to $20,000. The court, therefore, did not abuse its discretion when it overruled her objection concerning payment of the GAL fees.

**{¶ 186}** Wife's fifth cross-assignment of error is sustained as it relates to attorney fees and overruled as it relates to GAL fees.

### F. Compensation for Personal Property

**{¶ 187}** In her sixth cross-assignment of error, Wife claims the trial court erred when it awarded $12,250 to Husband for personal property in the division of the marital estate due to "lost items of personal property stored at the Bendemeer residence [that Wife] sold."

{¶ 188} The magistrate determined that awarding Husband $12,250 for Husband's purported "lost" items when comparing the appraised values of the parties' respective real estate was "equitable." The trial court overruled Wife's objection and adopted the magistrate's decision regarding the "lost" personal property.

{¶ 189} Husband testified that he stored some personal items on the third floor of the Bendemeer house while the property was rented. According to Husband, he drove by the property one day and noticed his personal items on the tree lawn. He learned that Wife had instructed the tenant to discard the items on the lawn with the garbage. When asked about the personal items he recovered from the lawn, the following discussion concerning the items and their purported value, in its entirety, occurred:

> Husband: Well, there [are] tools. There [are] golf clubs. There [are] some very expensive faucets. Probably $3,000. There is lot[s] of — some of the stuff, I picked things. Some valuable stuff [was] gone.

> Attorney: What is your personal belief about the value, the total value of your things that were store at Bendemeer that are missing?

> Husband: Honestly, I don't know. I would have to sit down and really think about it. It'd been sitting there for a while. Some of it appreciated. Some of it lost value. You know, I don't want to — I would have to — I don't know. Few thousand dollars for sure. $5,000.

> Attorney: Okay. Somewhere between 2 and 5 thousand dollars?

> Husband: There you go. * * * Yes.

{¶ 190} The record shows that Wife sold the Bendemeer property during the pendency of this divorce action and against the court's order, and Husband

apparently learned about the sale after driving through the neighborhood. Although a trial court enjoys broad discretion in deciding what is equitable upon the facts and circumstances of each case, and in this case the magistrate deemed equitable the $12,250 awarded to Husband in light of the appraised values of the parties' respective real estate, there is nothing in the record that supports the magistrate's assigned value to Husband's purportedly lost items. In fact, other than Husband's general recollection of a few items that may have been located in storage at the Bendemeer property and his best guess as to the items' value, there is no evidence of the purportedly lost items. At most, the record arguably supports an award of $5,000 to Husband.

{¶ 191} Wife's sixth cross-assignment of error is sustained.

### G. Double Dip

{¶ 192} In her seventh cross-assignment of error, Wife claims the trial court erred when it awarded Husband $58,418.64 for his share of the Bendemeer property when Wife had previously paid Husband $43,000 for his share of the property, thus constituting a duplicate award, or a "double dip." Within this assignment of error, Wife identifies her own testimony that she paid Husband $43,000 from the proceeds of the sale and asserts that because the trust account that contained the remainder of the proceeds was also divided between the parties, Husband's receipt of $29,209.32 from the trust was a "double dip."

{¶ 193} A trial court abuses its discretion when it counts a marital asset twice — once in the property division and again in the spousal support award. *Dean v.*

*Dean*, 8th Dist. Cuyahoga No. 95615, 2011-Ohio-2401, ¶ 31, citing *Heller v. Heller*, 10th Dist. Franklin No. 07AP-871, 2008-Ohio-3296, ¶ 19.

{¶ 194} The court awarded Husband $50,000 from the proceeds of the sale of the Bendemeer property as "compensation for the funds [Wife] knowingly withdrew in violation of mutual restraining orders and as a sanction for [Wife's] multiple contempt findings." Therefore, because the $50,000 was a sanction, it does not constitute a double dip.

{¶ 195} Wife's seventh cross-assignment of error is overruled.

H.  Division of Personal Property

{¶ 196} In her eighth cross-assignment of error, Wife claims the trial court abused its discretion in the division of certain personal property located in a safe deposit box, including "rings," a gold watch, "bracelets," and cuff links.  Wife essentially argues that the trial court erred in believing Husband's testimony, because the property is unsubstantiated, unknown to Wife, or does not exist.

{¶ 197} Regarding the personal property, the magistrate concluded as follows:

> To the extent the [gold watch, rings, bracelets, and cuff links] exist and can be identified, the court awards them to [Husband].  It is inherently problematic [that] these items were not described in further detail, as the description of, for example, "rings" is so ambiguous it lends itself to the possibility of confusion, especially between these parties. Nonetheless, if [Wife] is in possession of any of the above items, the court orders her to turn them over to her counsel within 30 days of the journalization of the divorce decree, so they may be returned to [Husband] through his attorney.

{¶ 198} Husband claimed that the jewelry in the safe deposit box is his separate property. He provided pictures of items purportedly in the box. Husband testified specifically regarding an engagement ring for which he paid $12,000 in cash, and he provided an appraisal for the ring. Although the magistrate found both parties in this divorce action lacked credibility, the magistrate evidently found some of Husband's testimony credible concerning items in the safe deposit box for which Husband provided supporting documentation. We defer to the magistrate as the factfinder to determine the credibility of the witnesses. *Allan*, 8th Dist. Cuyahoga No. 107142, 2019-Ohio-2111, at ¶ 80. And we have no basis for concluding that the magistrate lost his way in finding that these jewelry items are Husband's separate property.

{¶ 199} Wife's eighth cross-assignment of error is overruled.

## I. Child Support

{¶ 200} In her ninth and final assignment of error, Wife contends that the trial court erred when it failed to order Husband to pay child support during the pendency of the divorce.

{¶ 201} Civ.R. 75(N) governs the granting of temporary spousal and child support and permits a trial court to grant temporary support "for the party's sustenance and expenses" that occur during the pendency of a divorce action. "A temporary order is merely an order to provide for the needs of the parties during the pendency of the divorce action." *Schumann v. Schumann*, 8th Dist. Cuyahoga Nos. 83404 and 83631, 2005-Ohio-91, ¶ 50. The award and the amount of temporary

spousal and child support rests within the broad discretion of the trial court. *Davis v. Davis*, 12 Ohio App.3d 38, 40, 465 N.E.2d 917 (8th Dist.1983).

{¶ 202} On September 6, 2016, the magistrate held a hearing on the parties' motions for support. On September 27, 2016, following the hearing and after consideration of documents submitted by the parties, including income and expense affidavits, briefs containing tax returns and pay stubs, lists of real estate properties, and other financial information, the magistrate found as follows:

> [The parties] * * * have one minor child. [Wife] lives in the marital residence. The minor child is enrolled in a boarding school * * *. There is no monthly mortgage payment for the marital residence. The monthly real estate taxes and homeowner's insurance are $420. It is unknown where [Husband] lives currently.
>
> The Court finds that for purposes of temporary support the [Wife's] annual gross income is a base salary of $105,000 and $35,000 per year in commissions. She also has net rental income, exclusive of depreciation expense, of approximately $29,755.
>
> [Husband's] 2014 tax return shows adjusted gross income of $15,034. He states in his brief that he is self-employed in the real estate business. He has nine rental properties, some of which are in LLC's and some of which are multiple units. [Husband] executed a loan agreement with the Telshe Alumni Gemilus Chesed Fund where he lists his occupation as "financial advisor." [Husband's] 2014 income tax return states his principal business or profession as "financial & real estate consulting."

{¶ 203} The magistrate determined that Wife has sufficient income available to cover all of the child's needs while he is staying in her home and she has been paying the child's private boarding school expenses. The magistrate then ordered that "no child support order is made at this juncture of the proceedings * * * as the child is enrolled in a residential school and does not reside permanently with either

parent." The magistrate reserved jurisdiction to make a retroactive child support determination, if any, at the final hearing.

{¶ 204} On March 8, 2017, Wife filed a motion to modify the temporary support. She claimed in her motion that she was involuntarily terminated from her employment and her gross income "has decreased by $140,000." She also claimed that she did not have sufficient funds to continue to pay for the entirety of the expenses related to the minor child. Wife failed to present any evidence in support of her argument, and she failed to cite to any legal authority to support a modification. Following a hearing, the magistrate denied Wife's motion for modification. Rather, the magistrate concluded that Husband's child support obligation should commence on January 1, 2018. In overruling Wife's objections, the trial court found that Wife failed to present any evidence or cite to any legal authority in support of her argument regarding temporary child support and the magistrate was in the best position to weigh the evidence.

{¶ 205} From the record before us, and in light of the fact that Wife did not effectively contest the magistrate's findings, we fail to find the trial court abused its discretion in denying Wife's motion for temporary child support.

{¶ 206} Wife's final cross- assignment of error is overruled.

{¶ 207} Judgment affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN T. GALLAGHER, A.J., and
MARY EILEEN KILBANE, P.J., CONCUR